Argued November 22, 1976, affirmed in part, reversed in part and
remanded February 22, reconsideration denied March 30, petition for
review denied June 28, 1977

# CASCADE NATURAL GAS CORPORATION,
## *Appellant,*
### *v.*
# DAVIS, *Respondent.*
# (No. 90173, CA 6053)
#### 560 P2d 301

Gene C. Rose, Ontario, argued the cause for appellant. With him on the briefs were Yturri, O'Kief, Rose & Burnham and W. Brian Matsuyama of Jones, Grey & Bayley, Ontario.

Al J. Laue, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before Schwab, Chief Judge, and Thornton and Richardson, Judges.

RICHARDSON, J.

## RICHARDSON, J.

Cascade Natural Gas appeals a decree of the circuit court affirming an order of the Public Utility Commissioner in a rate making proceeding.

Cascade distributes natural gas to customers in eastern and central Oregon and in Washington. In April, 1974, Cascade filed proposed tariffs with the Commissioner seeking a rate increase and began a similar action in the state of Washington.

The Commissioner suspended the tariffs and held a hearing. On November 21, 1974, he issued his order allowing a rate increase less than requested, altering the rate design proposed by Cascade and excluding certain operating expenses from Cascade's rate base.

Cascade filed a complaint in circuit court alleging that the Commissioner was without authority to impose his own rate design, that exclusion of some of the operating expenses was not supported by substantial evidence and that he should have allowed Cascade's use of normalized accounting of tax depreciation for rate purposes. The court affirmed the decision of the Commissioner. Cascade appeals assigning six errors in the order.

■ The first assignment of error relates to the rate design imposed in the Commissioner's order. Rate design involves the spreading of the increased revenue allowed among the various classes of consumer served by the utility, i.e., the rate schedule which is applied to each class of customer to obtain the desired revenue. Cascade's proposed rate design was based upon a uniform across-the-board increase in all rates for each unit of gas consumed without any other changes in rate design.

■ Cascade raises two objections to the Commissioner setting a rate design. First, Cascade argues the repeal

in 1971 of ORS 757.530[1] removed the power of the Commissioner to prescribe a rate design. Cascade argues when reviewing proposed tariffs, the Commissioner is limited in his options to either approving or disapproving the rate design proposed by the utility.

The repeal of ORS 757.530 was part of a comprehensive redrafting of the statutes dealing with public utility regulation by the Advisory Committee on Public Utility and Carrier Law. The committee's comments to the suggested repeal of ORS 757.530 do not indicate an intention to abrogate the Commissioner's authority previously expressed in that statute. The committee's comments contain the following:

"ORS 757.505 to 757.550, 757.560 to 757.585, 757.595 (Complaints, investigations, hearings and orders)

"This group of procedural sections has been replaced by procedural sections consolidated in ORS chapter 756 (§§37-62) [ORS 756.500 to 756.610]."

We have recognized the power possessed by the Commissioner in utility regulation and discussed this power in some detail in recent cases before this court. *American Can Co. v. Davis,* 28 Or App 207, 559 P2d 898 (1977); *Publishers Paper Co. v. Davis,* 28 Or App 189, 559 P2d 891 (1977); *Pacific N.W. Bell v. Sabin,* 21 Or App 200, 534 P2d 984, Sup Ct *review denied* (1975). Although the precise issue posed here was not raised in these cases, we recognized the power of the Commis-

_____

[1] Former ORS 757.530 provided:

"If upon investigation the commissioner finds that:

"(1) Any rates, tolls, charges, schedules or joint rates are unjust, unreasonable, insufficient or unjustly discriminatory or are preferential or otherwise in violation of this chapter, he may fix and order substituted therefor just and reasonable rates, tolls, charges or schedules.

"(2) Any regulation, measurement, practice, act or service complained of is unjust, unreasonable, insufficient, preferential, unjustly discriminatory or otherwise in violation of this chapter, any service is unsafe or inadequate, or any reasonable service cannot be obtained or is not afforded, he may substitute therefor just and reasonable regulations, measurements, practices, service or acts and make such order respecting them and such changes in them as shall be just and reasonable."

sioner to set rates including the power to order a particular rate spread or rate design.

ORS 756.040 requires the Commissioner to represent the customers of utilities respecting services and rates:

"(1) * * * In respect thereof he shall make use of the jurisdiction and powers of his office to protect such customers, and the public generally, from unjust and unreasonable exactions and practices and to obtain for them adequate service at fair and reasonable rates.

"(2) The commissioner is vested with power and jurisdiction to supervise and regulate every public utility * * * in this state, and to do all things necessary and convenient in the exercise of such power and jurisdiction.

"* * * * *."

Setting a rate design relates directly to duties of the Commissioner to look after the interests of the utility's customers, to obtain a fair and reasonable rate and guard against discriminatory exactions. The authority to impose a rate design different from that proposed by the utility is encompassed in the statutory authority of the Commissioner granted in ORS 756.040.[2]

■ Cascade's second objection to the Commissioner's rate design is that if he has such authority it comes into being only upon a finding the proposed rate or rate design is unjust, unreasonable or discriminatory. We agree the authority of the Commissioner to set rates and rate design stems from the duty to obtain adequate service and fair and reasonable rates for consumers. We disagree with Cascade that the Commissioner has gone beyond this authority. That portion of the order regarding tariff schedules provides a view of the Commissioner's reasoning.

---

[2] *See also* ORS 756.565.

"All *rates, tariffs,* classifications, regulations, practices and service *fixed, approved* or *prescribed by the commissioner* and any order made or entered upon any matter within his jurisdiction shall be in force and shall be prima facie lawful and reasonable, until found otherwise in a proceeding brought for that purpose under ORS 756.580 to 756.610." (Emphasis supplied.)

"Although the company's particular per therm proposal is a reasonable approach to rate design, the current gas supply problems dictate, among other things, that rates be designed with respect to conservation considerations. Continued large discounts for spaceheating uses are contrary to a sound conservation policy. In addition, promotional schedules, such as Schedule 102, should be eliminated. Further, absent a cost study, minimum bills for Schedules 111, 170 and 172 should not be increased by the substantial amounts proposed by the company and all such minimum bills should be uniform for all applicants and not be subject to the current terms in the tariff calling for 'not less than' a specified amount.

"Staff recommendations throughout are moderate in nature and appear reasonable. They will be adopted for this proceeding. Additionally, the company's proposal regarding a revision of the applicability clause for Schedule 103 is approved. * * *"

There were conflicting proposals from Cascade and the Public Utility Commissioner's staff for rate design. After discussing and summarizing the proposals the Commissioner found the staff recommendations to be reasonable and adopted them. Regarding Cascade's plan of a simple across-the-board increase the Commissioner said this was a "reasonable *approach* to rate design." The obvious import of the Commissioner's order is that, though a reasonable approach, it did not accomplish what the Commissioner judged to be the best rate design.

■ Cascade argues the decision as to how much revenue is to be allowed is a matter affecting the utility and the consumer alike since the utility wants more revenue and the customers want lower rates. However, Cascade urges once the return has been allowed the rate spread or design does not affect the customer or the customer's interest and should be left as a managerial decision of the utility.

The managerial decision to charge a lower rate to a particular class of customers may be based, for example, on a desire to compete with other energy

sources, or to induce, by a lower rate, a particular class of consumer to install natural gas consuming equipment and appliances. This type of decision which offers a favorable rate to one class of customer, also of necessity shifts a greater burden of revenue production by increased rates to another class. The Commissioner's duty to oversee the interests of consumers incorporates the duty to guard against disparate and unfair rates.

■ The order of the Commissioner regarding tariff schedules was within his authority supported by substantial evidence in the record and substantial reasoning in the order. Beyond that the judgment of the Commissioner is not reviewable by this court. ORS 756.598; *Publishers Paper Co. v. Davis, supra.*

■ The second assignment of error challenges the disallowance by the Commissioner of $20,000 from the total expense allocable to Oregon which was expended by Cascade in preparation and presentation of the rate case. Cascade engaged the services of outside consultants to prepare and present the rate case in Oregon and Washington. The total expenditure for this service was approximately $232,400. Cascade proposed to allocate approximately one half to the Oregon rate case, i.e., $116,200. The Commissioner allocated the rate case expense on the basis of the number of customers served. Since Cascade serves fewer customers in Oregon than in Washington a lesser amount was allocated to Oregon. Application of this formula resulted in assignment of $72,004 to Oregon. The Commissioner determined this amount was excessive and reduced it by $20,000 to a total of $52,004.

The Commissioner noted in his order the allocation problem was not new, having been present in Cascade's last rate case. In that instance the Commissioner said the allocation should be based on the number of customers served in the two jurisdictions. Cascade does not dispute this method of allocation. The dispute stems from the Commissioner's deduction

from the allocation to Cascade's Oregon rate case of an additional $20,000. Cascade makes two objections to this expense reduction. First, it argues, there was no notice, either prior to or during the hearing, the Commissioner was considering a reduction in the rate case expense. Secondly, Cascade argues, there is no evidence in the record to support the finding leading to the conclusion to reduce the expenses.

The Commissioner's order states:

"* * * Rate case expense for Oregon's 16,000 average customers in 1973 would be $7.26 per customer compared to Washington's expense of $1.86 per customer. No company in Oregon as large as Cascade utilized outside consultants so extensively in preparation of a rate case. The $116,200 expense allocated to Oregon [in Cascade's proposal] represents 10% of the entire rate increase request in Oregon.

"The justification for an expenditure of this magnitude for outside help to prepare a rate case is certainly not evident. The company's Oregon ratepayers must not be burdened with a cost which is due principally to management's unwillingness or inability to present its own rate case. Nor should the Oregon ratepayers be burdened with a cost which is due in substantial part to the greater size of Cascade's Washington operations."

It appears from the order the Commissioner's reasoning for disallowance of $20,000 rate case expense was threefold. First, the amount of expense attributable to Oregon was calculated at approximately $7.26 per Oregon customer and comprised about 10 percent of the requested revenue increase. There was evidence from which this calculation could be made. Secondly, he found no Oregon utility of Cascade's size which utilized outside consultants so extensively, and thirdly, Oregon ratepayers must not be burdened with a cost due principally to Cascade management's unwillingness or inability to present its own rate case. There was no evidence in the record supporting these two findings.

These findings and reasons leading to the conclusion to excise the $20,000 expense item were first

disclosed in the Commissioner's order. There was no indication in the Commissioner's staff presentation that the total amount of rate case expense was in issue. The presentation by Cascade and the Commissioner's staff was concerned with how much of the total was to be allocated to Oregon ratepayers and the method of such allocation.

Cascade was not given an opportunity during the hearing to examine and challenge the hypothesis utilized in reducing the allowed cost for rate case presentation. The assumed facts underlying this decision may have been within the personal knowledge of the Commissioner or gleaned from his position, they were, however, not placed on the record during the hearing. Our Supreme Court in *Portland SS. Oper. v. Pilot Comm's,* 232 Or 495, 501, 375 P2d 420 (1962), said in reviewing an administrative order:

> "* * * The requirement that findings be supported by identifiable evidence rests upon the ground that the party adversely affected by the administrative order should have an opportunity for cross-examination and to offer evidence in rebuttal. * * *"

*See also Pierce Freight Lines v. Flagg,* 177 Or 1, 159 P2d 162 (1945).

There being no evidence in the record to support the disallowance of $20,000, the judgment of the lower court must be reversed and the cause remanded on that issue.

In assignment of error number three, Cascade makes two contentions relating generally to the disallowance of operating costs and normalization of depreciation expenses. First, that the particular expenses rejected were not within the scope of authority given the Commissioner by ORS 757.105(1).[3] The argument

---

[3] ORS 757.105(1) "The commissioner has the right and power of regulation, restriction and control over the budgets of expenditures of public utilities, as to all items covering:

"(a) Proposed payment of salaries of executive officers;

in essence is the Commissioner has authority only over the expense categories specifically enumerated in that statute. Secondly, Cascade contends, since ORS 757.105(3)[4] makes expenditures presumptively fair and reasonable there must exist standards by which this presumption may be tested and overcome by the Commissioner.

■■ We stated in *Pacific N.W. Bell v. Sabin, supra,* that ORS 757.105 represents an extension of the Commissioner's authority and not a limitation on his power to exclude a particular expense from the rate base in determining what would be a just and reasonable rate. Thus, the Commissioner's authority to disallow cost items from a rate base stems not from ORS 757.105, but from the power to set just and reasonable rates. Review of a utility's budget undertaken pursuant to ORS 757.105 does not foreclose or estop the Commissioner from disallowing a previously authorized expenditure in a rate determination case. *Pacific Tel. & Tel. Co. v. Flagg,* 189 Or 370, 220 P2d 522 (1950).

The utility's management may disagree and determine certain expenditures are good business judgment. However, in the rate making process the Commissioner does not invalidate the contracts which underlie the expenditures or require reimbursement, he merely requires such expenses deemed unwar-

---

"(b) Donations;

"(c) Political contributions and political advertising;

"(d) Expenditures for pensions or for a trust to provide pensions for employes and officers;

"(e) Other expenditures and major contracts for the sale or purchase of equipment; and

"(f) Any payment or contemplated payment to any person or corporation having an affiliated interest for service, advice, auditing, associating, sponsoring, engineering, managing, operating, financing, legal or other services."

[4] ORS 757.105(3) "When any such budget has been filed with the commissioner he shall examine into and investigate the same and unless rejected within 60 days thereafter, the proposed budget is presumptively fair and reasonable and not contrary to public interest."

ranted be paid from profits and not recouped from the ratepayers.

■ With the exception of the rate case preparation expense discussed earlier in this opinion, the other challenged expense deductions were contested by Cascade in the hearing. The utility proposing increased rates has the burden of showing the increased rates are just and reasonable. ORS 757.210. Setting of utility rates is a process of allowing a certain rate of return on a rate base, i.e., operating costs, reflected in the total amount of revenue needed to cover expenses of operation and realize a profit for investors. This incorporates a determination of which expenses are includable in the rate base. The reasonableness of these expenses is included in the burden of proof the utility has in justifying its proposed rate increase. The utility thus is aware its rate base will come under scrutiny by the Commissioner and it must justify those expenses it wishes to recoup through increased rates. The question is less one of the prehearing standards for application of the statute and more a question of opportunity for hearing and judicial review. *Warren v. Marion County et al,* 222 Or 307, 353 P2d 257 (1960).

■ Assignment of error number four challenges the Commissioner's disallowance of one half of the Chamber of Commerce dues paid by Cascade. The Commissioner allowed only one half of the dues "[i]nasmuch as stockholders share equally in the benefits of such expenses." There was conflicting evidence presented on the one-hand by staff witnesses and on the other by Cascade concerning the relative value of Chamber of Commerce membership to Cascade's ratepayers and stockholders. There was substantial evidence to support the Commissioner's conclusion stockholders and customers benefit equally and should share equally in the expense of membership.

■ Assignment of error number five contends, in

substance, there was not substantial evidence in the record to support the Commissioner's disallowance of $114 paid for season tickets to the Seattle Opera and the Seattle "Totems" Hockey Club. Regarding this expense the Commissioner's order provides:

> "Staff also proposed to disallow $114 in expenditures for season tickets to the Seattle Opera and the Seattle 'Totems' Hockey Club. Staff's position is that such entertainment expenses should not be borne by Oregon ratepayers. The company claims that these tickets are provided for the use of rank-and-file company employees as an additional employee benefit. As such, the company claims, the tickets should be considered in the same category with employee benefits such as social security, unemployment compensation, medical and hospital plans, pension benefits, sick leave, etc. Clearly, however, season tickets do differ in nature from the above-listed benefits. In addition, the tickets were not charged to an account covering employee benefits, but rather to the office supplies and expenses account. Staff adjustment is adopted."

There was substantial evidence in the record to support this conclusion and the Commissioner gave a rational basis for his decision to exclude the expense.

The final assignment of error contends the Commissioner should have allowed Cascade to normalize depreciation in calculating tax deductions for rate base purposes. Since 1963 Cascade had used a form of accelerated depreciation for tax purposes. In essence the accelerated depreciation method allows a greater deduction for depreciation in the first years after acquisition of the depreciable asset and declining deduction in later years. This is opposed to the straight line method where an equal amount of depreciation is deducted every year over the depreciable life of the asset. Because depreciation is deducted as an expense from gross income accelerated depreciation results in decreased tax in the early years of the assets life.

It is the policy of the Commissioner that tax benefits derived from use of accelerated depreciation be passed on to consumer through lower rates by

allowing only the actual tax paid as an expense includable in the rate base. This is known as "flow through" in the Commissioner's parlance. The effect of this policy being in the early years when depreciation deduction is high and taxes correspondingly low the utility rates are lower. In each succeeding year as depreciation deduction decreases and taxes increase rates should go up to cover the increase in rate base occasioned by higher tax expense. This would require periodic adjustments of the rate to correspond with increased tax expense.

So that new tariffs need not be sought each year Cascade proposed to set rates as if it calculated taxes based on a straight-line depreciation method, whereby in the early years of asset life Cascade would receive reimbursement for taxes through the rate structure greater than actual taxes paid. This excess would be held in reserve to meet higher taxes imposed in the later years of accelerated depreciation. This is known as normalized accounting of depreciation.

In response to the request to normalized accounting, the Commissioner stated in his order:

"Cascade proposed to use the straight-line depreciation method to calculate the federal income tax and state excise tax to be used to fix rates. It also proposed to begin normalizing accounting on January 1, 1975. Cascade utilizes liberalized depreciation for calculating income taxes and has used the declining balance method on all tax depreciable additions beginning in 1963. The record does contain information indicating somewhat the problem created when a utility flows through the impact of higher tax depreciation in early years of the life of an asset. As it is possible that growth in Oregon in the future will not be as great as in the past, it is obvious that future income taxes can and in all probability will be greater. No method to offset the impact of liberalized depreciation on income taxes during 1963 to date was proposed other than an allegation that the amounts would equalize in about 11 years. This record does not contain sufficient information or offer a solution that can be followed through in all logic.

[ 633 ]

"There is no persuasive evidence in the record to abandon flow through in this proceeding for Cascade."

Although the result of the Commissioner's decision was to exclude a greater tax expense from the rate base the decision simply involved a disinclination on the part of the Commissioner to change his policy regarding a normalized versus flow through accounting method for tax depreciation. The decision is thus not in the category of disallowing expense items in the proposed rate base. Cascade failed to persuade the Commissioner to change his policy. We cannot substitute our judgment for that of the Commissioner. ORS 756.598.

The only evidence regarding this issue was presented by Cascade. The evidence was not controverted and the witness was not cross-examined. Because of this, Cascade asserts a prima facie case for normalized accounting was presented, and there was not evidence to support denial of Cascade's request. The simple answer is the Commissioner, being the fact finder with the task of analyzing the evidence, is free to not regard it as probative. Cascade has the burden of persuasion which the Commissioner determined it had not met.

Affirmed in part; reversed in part and remanded.