In the Matter of the Petition of CONTINENTAL TELEPHONE COMPANY OF MINNESOTA, INC., for Authority to Change its Schedule of Telephone Rates for Customers within the State of Minnesota.

Nos. CX–84–1035, C7–84–1168.

Supreme Court of Minnesota.

July 3, 1986.

Thomas M. O'Hern, Sp. Asst. Atty. Gen., St. Paul, for Hubert H. Humphrey, III.

James D. Larson, Minneapolis, for City of Mound.

Karl W. Sonneman, Sp. Asst. Atty. Gen., St. Paul, for Minnesota Public Utilities Com'n.

Susan Rester, Sp. Asst. Atty. Gen., St. Paul, for Dept. of Public Service.

Robert F. Holz, Jr., Robert J. Douglas, Jr., Des Moines, Iowa, Martin G. Weinstein and Rebecca Palmer, Minneapolis, for Continental Telephone Co. of Minnesota, Inc.

COYNE, Justice.

On May 27, 1983, Continental Telephone Company of Minnesota, Inc., which pro-

vides telephone service to more than 100 exchanges scattered throughout Minnesota, filed with the Minnesota Public Utilities Commission (MPUC) a proposed schedule of increased rates. Pursuant to Minn.Stat. § 237.075 (1984), MPUC suspended operation of the proposed schedule and authorized an interim rate schedule. By its order of March 23, 1984, MPUC concluded that Continental was entitled to a rate increase, and on June 5, 1984, it approved a refund plan. The attorney general and Continental both sought review of portions of the final order and the City of Mound sought review of the interim rates and the refund plan. The court of appeals affirmed the portions of the final order of which Continental complained, disapproved the interim rates and reversed the refund plan authorized by MPUC, and remanded for further proceedings with respect to treatment of the cash unreserved account. *In the Matter of Continental Telephone Co.*, 358 N.W.2d 400 (Minn.App.1984). Only the propriety of the interim rates and refund plan and the treatment of the cash unreserved account are before us on this further review. We affirm in part, reverse in part, and remand for further proceedings in accordance with this opinion.

## I.

Primarily, Continental serves rural, outstate exchanges, but it also serves several metropolitan exchanges. Its customers are divided into three customer groups: metro, outstate rate group 1, and outstate rate group 2. In its petition of May 27, 1983, Continental sought authorization to increase its annual revenue by $7,212,120, and it proposed that this should be accomplished by increasing the rates for local access by 25 to 64 percent and by increasing charges for service calls and pay telephones.

Pursuant to section 237.075, subdivision 2 (1984), MPUC suspended operation of the proposed rate schedule and on July 7, 1983, authorized a schedule of interim rates suf-ficient to increase Continental's annual revenue by $4,785,629 pending MPUC's final determination. The interim rates increased the line access portion of the rates of customers in outstate groups 1 and 2 by 29.3 percent. The separately billed charge for extended area service was not increased. But while the local line access charge and the charge for extended area service were billed to the two outstate groups as separate items, metro customers were billed only a line access charge, into which the charge for extended area service had been "bundled." The 29.3 percent interim increase was applied to the entire combined or "bundled" charge so that, for metro customers, the interim rates increased the cost of extended area service as well as the local line access charge.

On March 23, 1984, MPUC issued its findings of fact, conclusions of law and order authorizing Continental to increase its gross annual revenues by $4,057,147 and ordering consolidation of the two outstate customer rate groups. At the urging of the City of Mound, a member of the metro rate group, and the Minnesota Department of Public Service, MPUC's order also directed severance of the charge for extended area service from the line access charge billed metro group customers. Since the interim rates produced annual revenue $728,482 in excess of that authorized by the final determination, by order of June 5, 1984, MPUC approved a plan providing for a refund pro rated according to the basis on which the interim rates had been imposed.

The City of Mound, one of five exchanges in the metro rate group, asserts that MPUC erred by approving an interim rate schedule which did not fall proportionately on Continental's three customer rate groups. MPUC counters with the contention that it properly set interim rates "by increasing local service rates across the board." Had MPUC actually limited application of its percentage increase to the local service or line access rate, leaving the

then existing rate design undisturbed, Mound's complaint would be without merit. The 1982 statutory revision requires the interim increase to be spread ratably across the consumer classes in accordance with the existing rate design. *In re Inter-City Gas Corporation*, 389 N.W.2d 897 (1986) (filed herewith); *In the Matter of Peoples Natural Gas Company*, 389 N.W.2d 903 (1986) (filed herewith).

■ If we may be forgiven a cliche, MPUC's position exalts form over substance. MPUC recognized in its final determination order that it would be inequitable to increase Continental's metro group exchange service rates, which include both local exchange service and extended area service components while excluding outstate extended area service rates from any increase, and it ordered severance of the two components in applying the increase authorized in the final determination. Nevertheless, in setting the interim rates, MPUC directed increase of the local service rate, a single component of the overall rates assessed the two outstate groups, while levying the same percentage increase against the metro exchange service rate or line access charge which comprised two components—the charge for extended area service as well as for local service—of the overall rates assessed the metro group. MPUC justifies this action by saying that because the metro extended area service charge was not specifically identified in the metro tariff, excluding that component from the interim rates or including the outstate extended area service rates, which vary among the several outstate exchanges, would have disrupted the existing rate design. Rate design, however, is not governed by the nomenclature a utility employs in its tariffs or by a utility's billing format. Rate design depends on the allocation of revenue responsibility among customer classes. By applying the interim rate increase to the unstated metro extended area service charge, MPUC changed the structure of

the individual rates and altered the allocation of revenue responsibility among the customer classes and, thus, departed from its own definition of rate design. Accordingly, the metro group customers are entitled to a refund of the amounts they were overcharged by reason of the interim change in the existing rate design—i.e., that portion of the interim rate attributable to the extended area service charge component.

■ Inasmuch as the annual revenues generated by the interim rate schedule exceeded those authorized by the final determination, the total amount of the overcharge should be deducted before computation of any other refunds. While we affirm the court of appeals' decision with respect to the overcharge resulting from the erroneous imposition of the interim rate increase, we reverse its determination that the interim rates were otherwise unfair and we reinstate MPUC's refund plan with respect to the balance of excess funds remaining after refund of the metro group overcharge, subject to the following modification. The statutory plan of telephone rate regulation, which parallels that of other utilities, requires that refunds due because revenues collectible under interim rates exceeded the revenues authorized in the final determination be distributed in the same proportions as the interim rate increase was allocated. *In the Matter of Peoples Natural Gas Company* (filed herewith). Of course, computation of the refund must be made subsequent to refund of the metro group overcharge. Hence, the metro group's proportionate share must be adjusted to reflect application of the interim rate increase only to the local service charge component of the metro exchange service rate.

## II.

The attorney general's residential utilities division challenges the inclusion of the "cash unreserved account" in Continental's

rate base without a concomitant inclusion of the interest earned on that account in Continental's operating income. The attorney general argues that inclusion of the cash unreserved account in the rate base while excluding interest earned on the account from consideration in the ratemaking process results in Continental's receiving a double return: one return through the rates charged its customers and a second return through interest received from depositaries.

In its findings of fact, conclusions of law and order of March 23, 1984, MPUC found that the cash unreserved account is a current asset properly included in cash working capital under the balance sheet method utilized by Continental. MPUC went on to make this finding with respect to the return on the account:

> However, without sufficient information about this account, it cannot properly be determined if the Company is earning a double return on this account and the dollar amount of the alleged double return. Because of the lack of substantiating evidence on this issue, the Commission will allow the inclusion of the Cash Unreserved Account in determining test year cash working capital without making an adjustment as urged by the RUD for a double return. However, if this account is a working capital issue in future Company rate cases, the Commission urges the parties to expand on the evidence presented.

MPUC denied the attorney general's petition for reconsideration on the ground that he had failed to establish the amount of income earned on the cash unreserved account. MPUC asserted that until there was evidence of the amount of such income, consideration of the treatment of interest income—whether or not it should be included in the ratemaking formula—was premature.

The court of appeals noted that the record discloses interest earned during only the first half of the test year and also observed that there is little evidence of how the interest income should be treated for ratemaking purposes. The court of appeals concluded that MPUC chose not to decide the question because the record was inadequate for resolution, and it remanded to MPUC for further proceedings to obtain evidence to support a reasoned decision.

■ We agree with the court of appeals that MPUC may not ignore facts suggesting a double return on an item included in the rate base and avoid deciding the proper ratemaking treatment on the ground that the evidence is insufficient to permit a proper determination. By statute MPUC is vested with the power to set just and reasonable rates for telephone companies. Minn.Stat. §§ 237.02 and 237.075, subd. 6 (1984). We have recognized that the statutory system gives MPUC *"the duty as well as the power* to set a just and reasonable rate after a full review of evidence and testimony." *Hibbing Taconite Co. v. Minnesota Public Service Commission,* 302 N.W.2d 5, 11 (Minn.1980) (emphasis added); *Northwestern Bell Telephone Co. v. State,* 299 Minn. 1, 216 N.W.2d 841 (1974). MPUC's duty, then, to make a just and reasonable determination encompasses consideration of the composition of both the rate base and the revenue requirements. Unless all significant issues have been resolved to its satisfaction, MPUC must refer the matter to the office of administrative hearings for public hearing as a contested case even though no interested party has requested it. Minn.Stat. § 237.075, subd. 2 (1984). If the parties to a contested case decline to cross-examine witnesses, MPUC must make inquiry to insure that the "testimony is well reasoned and constitutes substantial evidence." Minn. Stat. § 237.075, subd. 1a (1984). But although MPUC may inquire of witnesses and, as a decision making body, invite the parties to present additional evidence, MPUC has no obligation to obtain evidence. The duty to present evidence and to make a record adequate to permit MPUC to make a

reasoned decision is on the parties, not on MPUC.

In support of his contention that the cash unreserved account should not be included in the rate base, the attorney general introduced evidence that the account was earning interest which was excluded from MPUC's consideration of revenue requirements. Continental does not suggest that this cash account was lying idle. Conceding that the account, which had an average monthly balance of more than $7 million during the first six months of the test year, earns interest, Continental contends only that the uniform system of accounts applicable to the balance sheet method utilized by Continental directs that interest income should be accounted for as "other income." 47 C.F.R. § 31.313 (1985).[1] Continental and MPUC both contend that other income must be distinguished from operating income and set "below the line" and that items "below the line" do not enter into the ratemaking process.

■ Certainly, some types of "other income," such as income from real or personal property not used in telephone operations or income from nonregulated activities, should not be considered in setting telephone rates—not because it is "other income" but because the income producing assets are not part of the rate base. It seems to us that income derived from any asset which is a part of the rate base must be recognized in the determination of the petitioning utility's revenue requirements, regardless whether the asset is a telephone system that generates ordinary operating income or cash working capital which earns interest. The uniform system of accounts prescribed for use by telephone companies promotes consistency in the financial statements of a regulated industry. The express purpose of the income accounts is:

[t]o show as nearly as practicable for each calendar year the total operating revenues; the total operating expenses; the income and other operating taxes of the company; the income from securities owned; the net income from property not used in the company's communication operations; amounts accrued for interest costs; credits from interest charged to construction; miscellaneous income, expenses, and taxes; rents from and for operating property; profit or loss from nonregulated activities; and extraordinary and delayed income credits and charges.

47 C.F.R. § 31.3–30 (1985). Nothing in the federal regulations or the Minnesota Rules suggests that the system of accounts is determinative of the treatment of any item for purposes of setting rates or that the system deprives MPUC of its power or absolves it of the duty to decide the issues before it and to set just and reasonable rates.

■ It is apparent from both the record and MPUC's own findings of fact that the attorney general has raised a viable issue with respect to the appropriate treatment of the cash unreserved account and the interest it earns. Why else does MPUC urge the parties to expand on the evidence if the working capital issue recurs in future rate cases? MPUC declared in its denial of the attorney general's petition for reconsideration that it could not address the propriety of including interest in its consideration of the company's revenue requirements until the amount of earned interest had been proved and that the dollar amount was not firmly established. Certainly, the character of this item of income and whether or not it should enter into the determination of Continental's revenue requirements and the rate-setting mechanism can be decided before the amount of interest is established. Only if the item is to be entered into the ratemaking process is there any necessity to prove the amount.

---

1. The Federal Communications Commission requires telephone companies to follow the uniform system of accounts set out at 47 C.F.R. § 31.01–1 *et seq.* (1985). Minnesota also requires telephone companies having gross operating revenues of $100,000 or more to use the same system. Minn.Rules 7810.6400 (1983).

One would think, however, that since the record reveals the amount of interest the account earned during the first six months of the test year, the annual amount could be projected over the balance of the test year in much the same fashion as are other items of income and expense. Furthermore, the effect of MPUC's orders is to impose on the attorney general the burden of proving the amount of the interest. Minn.Stat. § 237.075, subd. 4 (1984), however, provides that "[t]he burden of proof to show that the rate change is just and reasonable shall be upon the telephone company seeking the change." The burden cast on the petitioning telephone company is to prove to MPUC's satisfaction the accuracy of its proposed inclusion of assets in the rate base and its proposed revenue requirements to be realized from its requested schedule of increased rates. If the evidence does not permit determination of the proper composition of the rate base or the amounts and sources of income to be included in the computation of the telephone company's revenue requirements, the telephone company has failed to sustain its burden of proving that its proposed rate change is just and reasonable. In such event MPUC must either deny the rate increase in its entirety or make appropriate adjustment to the company's proposal.

It seems to us only reasonable that, as a general rule, all income derived from a regulated asset—that is, an asset included in the rate base—as well as the tariffs paid by a utility's rate-paying customers should be applied in satisfaction of the utility's revenue requirements. We recognize, however, that treatment of the interest income on the cash unreserved account may affect other aspects of the rate setting process, and we defer to MPUC's expertise to determine the applicability of such a general rule in any particular case. Therefore, we remand so that MPUC may determine the appropriate treatment of the cash unreserved account and the interest earned on that account.

Affirmed in part, reversed in part, and remanded to the Minnesota Public Utilities Commission for further proceedings in accordance with this opinion.

YETKA, J., dissents.

YETKA, Justice (dissenting in part).

The reasoning insofar as my dissent is concerned is the same as that contained in *In re Application of People's Natural Gas Company*, 389 N.W.2d 903 (1986), released this same date.