In re Petition of INTER-CITY GAS COR-
PORATION for Authority to Change its
Schedule of Rates for Gas Service in
Minnesota.

No. C9–84–1169.

Supreme Court of Minnesota.

July 3, 1986.

898

James D. Larson, Minneapolis, for Conwed Corp.

Karl Sonneman, Sp. Asst. Atty. Gen., St. Paul, for MPUC.

Michael Bradley, Sp. Asst. Atty. Gen., St. Paul, for Residential Utilities Div. of Atty. General's Office.

John A. Knapp, Minneapolis, for Boise Cascade.

Christopher K. Sandberg, Sp. Asst. Atty. Gen., St. Paul, for Dept. of Public Service.

Thomas J. Barrett, Sp. Asst. Atty. Gen., St. Paul, for Dept. of Energy and Economic Development.

Samuel L. Hanson, Minneapolis, for Inter-City Gas.

COYNE, Justice.

On June 10, 1983, Inter-City Gas Corporation, which supplies natural gas service to consumers in northern Minnesota, filed with the Minnesota Public Utilities Commission (MPUC) a proposed schedule of increased rates. Pursuant to Minn.Stat. § 216B.16 (1984), MPUC suspended operation of the proposed schedule and, on July 22, 1983, authorized an interim rate schedule which was to be effective pending MPUC's final determination. By its order of April 10, 1984, MPUC concluded that Inter-City was entitled to a rate increase, and on June 4, 1984, it confirmed both its order setting the interim rate schedule and its final determination. Conwed Corporation sought review, alleging that MPUC improperly denied refunds to the large volume-firm class, of which Conwed is a member. The court of appeals affirmed. *Petition of Inter-City Gas Corp.*, 358 N.W.2d 692 (Minn.App.1984). We also affirm.

Inter-City's largest customer, Boise Cascade Corporation, pays rates established by individual contract rather than by tariff. Inter-City's other customers are divided into three consumer classes: general service, interruptible, and large volume-firm. When Inter-City sought authorization to increase its annual revenues by $3,251,800, it proposed that the major portion of the increase be billed to the general service class, with the remainder allocated to the interruptible class. The proposal did not contemplate any change in the contract arrangement with Boise Cascade or any increase in revenue from the large volume-firm class.

Pursuant to Minn.Stat. § 216B.16, subd. 2 (1984), MPUC suspended operation of the proposed schedule of rates until a contested case hearing could be held and a final determination made regarding the reasonableness of the proposed increase. Then MPUC issued an order setting interim rates sufficient to increase Inter-City's annual revenue by $2,737,100 pending a final determination and allocating the interim in-

crease pro rata among the consumer classes in accordance with the contribution made by each class to Inter-City's non-gas margin.

After the contested case hearing, MPUC determined that Inter-City was entitled to revise its schedule of rates and to collect an additional $2,787,288 in annual revenues—an amount less than that proposed by Inter-City but $50,188 more than that generated by the interim rate schedule. No party objected to Inter-City's proposed revenue allocation. MPUC concluded that the large volume-firm class should receive no increase in revenue responsibility and that Inter-City's proposed revenue increases allocated to the general service and interruptible classes should be decreased proportionately to reflect the overall revenue increase actually allowed.

On appeal Conwed contests only the implementation of the interim rates. Since, Conwed contends, no increase in the revenue responsibility allocated to the large volume-firm consumer class was either proposed by Inter-City or granted by MPUC in its final determination, the members of that class are entitled to a refund of amounts paid as a result of higher rates during the interim period, regardless whether the annualized interim revenues were more or less than those permitted in the final determination.

In 1982 the legislature revised the statutory procedure for public utility rate changes. Act of March 15, 1982, ch. 414, 1982 Minn.Laws 261. Minn.Stat. § 216B.16, subd. 1 (1984) provides that unless the commission orders otherwise, no public utility may change a duly established rate except upon 60 days' notice to MPUC. MPUC may, however, suspend the rate change for a period not to exceed ten months. Minn.Stat. § 216B.16, subd. 2 (1984). Under the prior law, when MPUC suspended operation of the new rate schedule, the public utility could petition for immediate implementation of the new rate schedule under a bond conditioned on the refund of any excess amounts collected if the final determination resulted in rates lower than those under bond. Minn.Stat. § 216B.16, subd. 3 (1980). The 1982 amendment of section 216B.16 substituted the following procedure for effectuating interim rates:

Subd. 3. *Interim rates.* Notwithstanding any order of suspension of a proposed increase in rates, the commission shall order an interim rate schedule into effect not later than 60 days after the initial filing date. The commission shall order the interim rate schedule ex parte without a public hearing. Notwithstanding the provisions of sections 216.25, 216B.27 and 216B.52, no interim rate schedule ordered by the commission pursuant to this subdivision shall be subject to an application for a rehearing or an appeal to a court until the commission has rendered its final determination. Unless the commission finds that exigent circumstances exist, the interim rate schedule shall be calculated using the proposed test year cost of capital, rate base, and expenses, except that it shall include: (1) a rate of return on common equity for the utility equal to that authorized by the commission in the utility's most recent rate proceeding; (2) rate base or expense items the same in nature and kind as those allowed by a currently effective order of the commission in the utility's most recent rate proceeding; and (3) no change in the existing rate design. In the case of a utility which has not been subject to a prior commission determination, the commission shall base the interim rate schedule on its most recent determination concerning a similar utility.

If, at the time of its final determination, the commission finds that the interim rates are in excess of the rates in the final determination, the commission shall order the utility to refund the excess amount collected under the interim rate schedule, including interest on it which shall be at the rate of interest determined by the commission. * * * *

Minn.Stat. § 216B.16, subd. 3 (1984). The prohibition against any interim change in the existing rate design is reinforced by the 1982 addition of this sentence to subdivision 5 of section 216B.16: "Rate design changes shall be prospective from the effective date of the new rate schedules approved by the commission."

Shortly after enactment of the 1982 amendment of section 216B.16, MPUC issued a policy statement on interim rates in which it set out its interpretation of the new statutory plan: "The Commission interprets that 'no change in the existing rate design' applies to both the allocation of revenue responsibility among customer classes (or product and service categories) and the structure of the individual rates. Accordingly, interim rates should consist of the existing rate schedules with an interim rate adjustment equal to the overall requested interim increase percentage." The pro rata increase provided by MPUC's interim rate order in this proceeding was consistent with its interpretation of the statute.

Inasmuch as the interim rate schedule produced less revenue annually than the final schedule of rates, there is no excess amount available for refunds. Therefore, Conwed attacks the interim rates as unjust and unreasonable and, hence, violative of the requirements of Minn.Stat. § 216B.03 (1984). The basic thrust of the consumer argument is that MPUC's definition of "rate design" is too narrow. According to MPUC, "rate design" means the actual allocation of revenue responsibility among the consumers as finally determined in the immediately preceding rate case instituted by the utility. From the consumer's viewpoint "rate design" encompasses cost of service studies, the utility's proposals, and the actual changes in allocation which MPUC has ordered in prior cases. None of these, Conwed argues, suggest that pro rata or "across the board" increases are a likely result of the utility's proposal. In essence then, Conwed contends that "existing rate design" incorporates not only the existing allocation of charges among the consumer classes, but also the method adopted in the past for allocating increases (for example, increasing rates of those consumer classes whose revenue contributions are less than the cost of service to them) and a prediction of the rates which will be finally determined in the pending case.

Minn.Stat. § 216B.02 (1984) sets out definitions for several terms used in chapter 216B, but the term "rate design" is not one of those defined. Although "rate design" is a term commonly used by both utilities and regulatory bodies in the course of the ratemaking process, the term first appeared in the statutory regulatory plan in the 1982 amendment and we have not previously had occasion to consider its meaning. Courts in other jurisdictions have said that "[r]ate design refers to the determination of the appropriate charges for different classes of customers and services that will generate the required revenue level," *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 448 A.2d 272, 313 (Me.1982); "[r]ate design involves the spreading of the increased revenue allowed among the various classes of consumer served by the utility, i.e., the rate schedule which is applied to each class of customer to obtain the desired revenue," *Cascade Natural Gas Corp. v. Davis*, 28 Or.App. 621, 623, 560 P.2d 301, 303 (1977); and "[t]he distribution of the revenue requirements among the various services [i.e., consumer classes] is called rate design," *Texas Alarm and Signal Association v. Public Utilities Commission*, 603 S.W.2d 766, 768 n. 2 (Tex.1980).

Certainly, the process of designing a rate structure—that is, the process of developing a rate design—entails a good deal more than simply drawing up a schedule of rates. As Inter-City points out, the determination of an appropriate rate design involves a review of studies of the cost of providing service; the consideration of non-cost factors, such as continuity, stability,

value of service, effects of competition, ability to pay increases, and the ability to "pass on" increases or "write off" costs on taxes, as well as the development of specific rate schedules from which each customer's charge is calculated. In short, the selection of an appropriate rate design is a quasi-legislative or policy determination. *Hibbing Taconite Co. v. Minnesota Public Service Commission,* 302 N.W.2d 5, 9 (Minn.1980); *St. Paul Area Chamber of Commerce v. Minnesota Public Service Commission,* 312 Minn. 250, 260, 251 N.W.2d 350, 357 (1977).

■ Given the nature and complexity of the ratemaking process, to define "rate design" as nothing more than the existing rate schedules or, as MPUC puts it, the actual allocation of charges fixed in the utility's last rate case seems an oversimplification. Nevertheless, the very complexity of the process suggests that the legislature used the term "rate design" in that sense in the 1982 amendments to section 216B.16: For purposes of regulation "existing rate design" means the existing allocation of revenue responsibility among consumer classes and the structure of individual rates as set by the existing rate schedules. That this definition comports with legislative intent is confirmed by the legislative history of the 1982 revision. Because the commission seldom approved a utility's proposed rate increase in its entirety, temporary rates under bond, equal to the utility's proposed rates, frequently produced revenues significantly greater than the utility was permitted to retain, necessitating refund of the overcharge. The practice of imposing rates under bond caused frequent and wide fluctuations in consumer charges, and these drastic fluctuations, together with delays in making refunds and the payment of what consumers sometimes regarded as inadequate compensation for the use of their funds, engendered public dissatisfaction. The revised procedure for setting interim rates tends to inhibit rate fluctuations and reduce the necessity for refunds.

Section 216B.16, subdivision 3, requires MPUC to order an interim rate schedule into effect not later than 60 days after the utility has filed notice of its proposed rate changes. The interim rate schedule is issued ex parte without public hearing. The interim rate schedule must reflect only projected increases in the cost of capital, in the cost of items of the same kind and nature as those included in the existing rate base, and in expenses of the same nature and kind as those finally allowed in the most recent rate proceeding. The interim rate schedule cannot work any change in the currently authorized rate of return on common equity or in the existing rate design. Thus, matters which call for policy decisions or the exercise of discretion—the authorized rate of return on equity, the nature and kind of items properly includible in the rate base or allowable as expenses, and the rate design—remain constant in the interim between the initial filing of the changes proposed by the utility and MPUC's final determination.

■ Conwed contends, however, that "rate design" is based on cost of service so that interim rates should not set pro rata increases "across the board." Even if the rate design is unchanged, Conwed argues, interim rates should reflect the increase in the non-gas cost of providing service to each particular class of consumer. Although it has been said that, historically, the cost-of-service criterion has been the basis for utility rate structures in Minnesota, we have recognized in previous cases that in deciding how, and from whom, additional revenue is to be obtained, MPUC may, and does, balance both cost and non-cost factors in order to achieve a fair and reasonable allocation of the increase among consumer classes. *St. Paul Area Chamber of Commerce,* 312 Minn. at 262, 251 N.W.2d at 357. While the extent to which MPUC relies on cost and non-cost factors is seldom clear, we have held that, unless MPUC can be shown to have relied on certain factors to the extent that clear

injustice has resulted or that its legislative authority has been clearly exceeded, the courts may not restrict the scope of matters which MPUC may consider in allocating costs among consumers. *Id.* at 256–57, 251 N.W.2d at 355. Moreover, since certain costs are not directly attributable to the service furnished any particular consumer class, the cost of service study itself involves a certain arbitrariness which is reflected in the unit costs. Although we do not intend to foreclose the possibility that cost of service could constitute the single criterion for adoption of a rate design, in this case Conwed concedes that the actual allocation of revenue responsibility or schedule of rates in effect on June 10, 1983, when Inter-City filed its proposed rate schedule was not based solely on the cost of service.[1]

The time strictures on MPUC action in setting interim rates and the absence of any public hearing militate against the introduction of any element of uncertainty into the existing rate design. It seems to us that reference to cost of service studies, the methods and rationale employed in earlier cases, the utility's current proposal, or predictions of the final determinations would demand much the same exercise of discretion that enters into MPUC's final determination, a process unsuited to an ex parte proceeding. The actual allocation of charges filed in the utility's last rate case and the rate schedules based on that allocation constitute a readily identifiable and certain existing rate design for purposes of setting interim rates.

■ It is Conwed's position, however, that a proportionate across-the-board interim increase based on the existing rate design, as we have defined the term, results in interim rates which are unjust and unreasonable and constitutes a denial of due process. Minn.Stat. § 216B.03 (1984), requires that "[e]very rate made, demanded, or received by any public utility * * * shall be just and reasonable." Interim rates, like those finally determined, must comply with the statutory requirement. The criterion for compliance, however, is not MPUC's final determination in the pending rate case. That interim rates were higher than the final rates does not mean that the interim rates are either unjust or unreasonable.

■ Interim rates are in large measure a function of the existing rate design. Under section 216B.16, subdivision 3, the authorized rate of return on common equity is held constant. The character of the rate base and allowable expenses remains the same—only their level is increased. The existing rate design is unchanged, but it dictates the allocation among the consumer classes of the additional revenue required to meet the increases in the rate base and expenses. Since the rate of return, the rate base and allowable expenses, and the rate design were all finally determined in the immediately preceding rate proceeding, these elements of the interim rate schedule are presumptively reasonable and, in addition, products of a proceeding conducted in accord with principles of due process. Increasing the rates pursuant to the existing rate design in an amount sufficient to permit the utility to recover certain of its increased costs during the pendency of the present proceedings does not convert the prior determination into an unjust or unreasonable one.

■ The reasonableness of the interim increase itself is assured by the statutory provision for refund in the event "that the interim rates are in excess of the rates in the final determination." Minn.Stat. § 216B.16, subd. 3 (1984). Inasmuch as the final determination is the object of the entire ratemaking process, a process which fully comports with notions of due process

---

1. *See also In the Matter of the Application of Peoples Natural Gas Company,* 389 N.W.2d 903 (1986) (filed herewith).

(no party contends otherwise), the amount of the interim increase—the one element of the interim rates ordered ex parte—has been subjected to due process requirements during the course of the present rate case. If the revenue requirement recognized in MPUC's final determination in the current rate case is reasonable, so also is the interim rate prescribed by the statute, subject to the statutory refund provisions.

■ Although the statutory scheme provides for issuance of the interim rate schedule ex parte without public hearing and defers application for rehearing or appeal until MPUC has rendered its final determination, reconsideration by MPUC or judicial review on appeal is available, but only in the event MPUC fails to comply with the statutory requirements for interim rates—e.g., an interim rate schedule which departed from the existing rate design.

■ A statute which sets out the procedure for the regulation of utility rates affects neither a fundamental right nor a suspect classification and, hence, whether it satisfies due process requirements is tested by limited judicial review: the statute is valid if it is "rationally related to achievement of a legitimate governmental purpose." *Essling v. Markman*, 335 N.W.2d 237, 239 (Minn.1983). If a rational relationship exists—and it seems to us that the statutory provisions for interim rates are rationally related to achieving stability and avoiding wide fluctuations in utility rates while reasonably balancing the interests of consumers and utilities—it is not for the courts to question the wisdom of the legislative scheme for balancing those competing interests. *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979).

Affirmed.

YETKA, Justice (dissenting in part).

The reasoning insofar as my dissent is concerned is the same as that contained in

*In re Application of People's Natural Gas Company*, 389 N.W.2d 903 (1986), released this same date.