**In the Matter of the Application of PEOPLES NATURAL GAS COMPANY for Authority to Increase Rates for Gas Utility Service in Minnesota.**

**Nos. C5–84–875, C9–84–913, C0–84–914, C8–84–921 and C6–84–934.**

Supreme Court of Minnesota.

July 3, 1986.

Lawrence G. Acker, Washington, D.C. and Robert S. Lee, Minneapolis, for Hanna Min. Co., Erie Min. Co. and Hibbing Taconite Joint Venture.

Kenneth R. Pepperny, Rafael Caminero, Pittsburgh, Pa., and Jeffrey J. Strand, Minneapolis, for U.S. Steel Corp.

R.C. Hemmersbaugh, Silver Bay, for Reserve Min. Co.

James J. Ryan, Cincinnati, Ohio, for Eveleth Taconite Co., and Reserve Min. Co.

Elmer B. Trousdale, St. Paul, and Philip Crowley, Council Bluffs, Iowa, for Peoples Natural Gas Co.

Karl Sonneman, Allen E. Giles, Sp. Asst. Attys. Gen., St. Paul, for MPUC.

Susan Rester, Sp. Asst. Atty. Gen., St. Paul, for Dept. of Public Service.

Warren M. Yalowitz, Chicago, Ill., for Inland Steel Co.

COYNE, Justice.

The six taconite producers served by Peoples Natural Gas Company—The Hanna Mining Company, Erie Mining Company, Hibbing Taconite Joint Venture, United States Steel Corporation (USS), Eveleth Taconite Company, and Reserve Mining Company—challenge the schedule of interim rates authorized by the Minnesota Public Utilities Commission (MPUC) during the pendency of Peoples' petition for increased rates and MPUC's refund plan, asserting that they do not comport with the provisions of Minn.Stat. § 216B.16 (1984) and are violative of due process. The court of appeals affirmed. *In the Matter of the Petition of Peoples Natural Gas Co.*, 358 N.W.2d 684 (Minn.App.1984). We now affirm.

Peoples supplies natural gas service to consumers in rural areas and southeastern and east central Minnesota, to six communities in the northwestern part of the state, and to six taconite companies on the iron range. Its customers are divided into six classes: general service, small volume-firm, small volume-interruptible, large volume-firm, large volume-interruptible, and taconite. On April 8, 1983, Peoples filed with MPUC a proposed schedule of increased rates. The proposed rate schedule was fashioned to produce additional annual revenue of $2,622,000, all of which was to be allocated to the general service class.

Pursuant to Minn.Stat. § 216B.16 (1984), MPUC suspended operation of the proposed schedule and, on June 1, 1983, authorized an interim rate schedule which was to be effective pending MPUC's final determination. Peoples proposed to allocate the entire interim revenue increase to the general service class—on the theory that such an allocation was consistent with MPUC's decisions in Peoples' two preceding rate cases and represented no departure from the existing rate design. MPUC declared, however, that Peoples' proposal for assessing the interim rate *would* constitute a change in the existing rate design. Because it found no exigent circumstances, MPUC concluded, in keeping with its stated policy, that all customer classes should pay a proportional share of the interim increase. The increased rates set by the interim rate schedule were sufficient to generate additional annual revenues of $2,035,000.

By its order of February 8, 1984, MPUC concluded that Peoples was entitled to increased gross annual revenues of $829,000 to be collected entirely through increasing the general service commodity charges. MPUC also directed Peoples to refund all interim collections in excess of the increase authorized in the final determination, the refund to be distributed to all customer classes in the same proportions as their contribution to Peoples' non-gas costs—i.e., the refund was to be allocated on the same basis as the interim increase. By its April 26, 1984 order of reconsideration, amended on June 22, 1984, MPUC reduced Peoples' authorized increase of gross annual revenues to $276,000 (about 10% of Peoples' proposed revenue increase), and it confirmed its refund plan.

MPUC's allocation of the revenue increase provided by the interim rate schedule and its refund plan of distribution were consistent with the MPUC Statement of Policy on Interim Rates issued April 14, 1982. The petitioners contend that because the policy statement was not promulgated as a rule in accordance with the requirements of the Administrative Procedure Act (APA), Minn.Stat. §§ 14.01–14.69 (1984), it was neither necessary nor proper to follow the stated policy.

■ The declared purpose of the policy statement is "to inform regulated companies of the expectations of the Minnesota Public Utilities Commission concerning petitions for approval of interim rates which are filed in conjunction with general rate cases," and while MPUC recognizes that it does not have the force or effect of law, the policy statement is characterized as "an expression of the Commission's general intention which will be followed unless circumstances demonstrate the policy to be inappropriate." Focusing primarily on how the provisions regarding existing rate design affects interim rates and refunds, the statement sets out MPUC's interpretation of Minn.Stat. §§ 216B.16 and 237.075 (1980), as they were amended by Act of March 15, 1982, ch. 414, §§ 4 and 10, 1982 Minn.Laws 261, 262, 266. We have held that interpretive rules fall within the statutory definition of rule and must be promulgated according to the requirements of the APA.[1] *Johnson Brothers Wholesale Liquor Co. v. Novak*, 295 N.W.2d 238, 242 (Minn.1980). The issue, however, is not whether MPUC followed proper rulemaking procedures in issuing its policy statement but whether it correctly interpreted and applied the statutory provisions in this case. That MPUC may have articulated its construction of a statute in a rule improperly promulgated does not render a correct interpretation incorrect. *Cf. Cable Communications Bd. v. Nor-West Cable*, 356 N.W.2d 658, 667 (Minn.1984). While slavish adherence to a defective rule might well prove troublesome, MPUC recognizes that, unlike a properly promulgated rule, its policy statement does not have the force and effect of law. The statement expressly notes that in each case the policy set out in the statement will merely provide the starting point for deliberation, "but the final decision will depend upon the facts of the case."

The taconite producers contend, however, that MPUC has misconstrued the statute both with respect to setting interim rates and directing refunds. Like the consumer in *In re Petition of Inter-City Gas Corporation*, 389 N.W.2d 897 (Minn.1986) (filed herewith), the taconite producers insist that "existing rate design" means something more than the allocation of charges fixed in the utility's last rate case, that the definition must incorporate the methods and rationale previously employed in allocating charges and embody the allocations of increased revenue proposed in the pending case. For the reasons expressed in the Inter-City case, we regard MPUC's definition as the more accurate and workable one—a definition generally applicable in the setting of interim rates.

Even if MPUC's definition is usually applicable, the taconite producers argue, it is inapplicable in this case. They say that the statute mandates that interim rates be consistent with MPUC's "rate design objectives as demonstrated by its final order in the preceding general rate case" and that the order in the preceding case, as well as the order in the case before that, allocated the entire increase to the general service class.

■ In its petition for an interim rate increase Peoples proposed to allocate the

1. We note that the policy statement also encourages the inclusion of a petition for an interim rate increase in any application for a rate change and lists the information and supporting schedules which should accompany an interim rate petition. Since, however, none of the parties complain that MPUC adopted a procedural rule without following the APA rulemaking procedure, we do not reach that question.

entire interim revenue increase to the general service class, in the apparent belief that the proposal was consistent with MPUC's decision in Peoples' 1982 and 1981 rate cases and that it represented no change in rate design from that approved by MPUC in Peoples' preceding case. MPUC found, however, that Peoples' proposal for allocating the interim increase *would* constitute a change in the existing rate design. That determination seems to us amply supported by the final determination issued January 28, 1983 in Peoples' 1982 rate case. Furthermore, in its findings and conclusions in the present case, MPUC expressly stated that it had based its decision in the 1982 rate case on *both* the results of class cost of service studies *and* consideration of non-cost factors and that it was doing so again in the present case. It is quite apparent that the allocation to the general service class of almost the entire revenue increase authorized in both the 1982 and 1981 rate cases tended— and was intended—to bring the rates charged and the cost of service to each class closer to equilibrium. But it is equally apparent that MPUC refused to lower the rates of the taconite, rural, and large volume—firm and interruptible—classes even though they provided revenues in excess of cost of service. Hence, while we agree with the taconite producers that if the existing rate design is in fact a cost-of-service design, cost-of-service may be a suitable basis for allocating an interim increase, this is not such a case. Here, MPUC found that the existing rate design was not a cost-of-service design—a determination MPUC is uniquely positioned to make—and properly invoked the generally applicable rule. Moreover, it seems to us that, since non-cost factors frequently find their way into rate design, MPUC should identify in its final determination any rate design based solely on cost of service. Then, to the extent interim rate increases are attributable to increased cost of serving a particular class, interim rates could be calculated on cost-of-service basis without disturbing the existing rate design.

Finally, the taconite producers claim that if it is not permissible to depart from the existing rate design and if the existing rate design is not based only on cost of service, then MPUC should have found that exigent circumstances existed, justifying adoption of Peoples' proposed allocation of the interim rates. Minn.Stat. § 216B.16, subd. 3 (1984), does permit departure from the statutory formula when there are exigent circumstances. The term "exigent" bespeaks urgency or emergency. Certainly, the matter is important to the parties here, but the fact that Peoples proposed a rate increase allocated only to the general service class hardly suggests a pressing need of the type which would justify abandoning the statutory plan for interim rates and taking extraordinary action.

Of course, the pivotal issue here is the propriety of MPUC's refund plan. MPUC's order directed Peoples to refund the difference between the revenue collected on the interim rates and that allowable under the increased rates authorized by the final determination and to distribute the refund among "all customer classes based on each class's contribution to Peoples' non-gas costs, in order to parallel the manner in which the interim rate increase was distributed to customer classes."

The taconite producers argue that by allocating the entire rate increase to the general service class in its final determination, MPUC found that any increase in the level of rates charged the taconite producers above the level declared just and reasonable in the preceding rate case would be unjust and unreasonable. Therefore, say the taconite producers, the entire increase charged them under the interim rates was unjust and unreasonable: the interim increase constituted an "overcharge." Unless, the argument continues, the full amount of the "overcharge" unjustly exacted from them is refunded, the imposition of the interim rate increase amounts to an unlawful "taking" of their property.

As MPUC remarked, the taconite producers' equitable argument is very at-

tractive—at first glance. Surely, a consumer who is overcharged should be entitled to a refund. A more penetrating examination, however, reveals the flaw in the argument. While the taconite producers correctly assert that interim rates must comply with the statutory requirement that "[e]very rate made, demanded, or received by any public utility * * * shall be just and reasonable," Minn.Stat. § 216B.03 (1984), they measure compliance by the rates fixed by the final determination. But judging the reasonableness of interim rates by reference to the final determination—and calling any interim rate greater than that provided by the final determination an "overcharge"—does not comport with the statutory plan; that is simply to give retrospective effect to the final determination. That the final determination in the present case did not change the rates charged the taconite producers does not validate the argument that compliance with section 216B.03 is tested by the final determination in the preceding rate case. The refund plan urged by the taconite producers necessarily imposes on the general service class an interim rate equal to the rates fixed by the final determination in this case—i.e., a retrospective application of the new rates and rate design. Had the legislature abolished the discretionary setting of rates under bond by directing MPUC to set interim rates according to a statutory formula and then to make its final determination retroactive to the date the interim rates became effective, we could accept the taconites' argument. But that is not the plan chosen by the legislature. The statute mandates that the new rates and rate design shall be effective prospectively only. Furthermore, the decision in this proceeding to allocate the entire authorized increase to the general service class cannot be interpreted as a determination that allotting any interim increase to the taconite class was unreasonable. Reasonableness is a concept of some flexibility and moderation, not exclusivity; a determination that one course of conduct is reasonable is not a determination that any other course is unreasonable.

We are not indifferent to the taconite producers' plea that this case be decided on its own facts without regard to other rate cases with different factual settings, but the issues presented here turn on statutory construction, which can hardly proceed on a case by case basis. We are of the opinion that the only way the present statutory plan of utility rate regulation can be carried out consistently is to allocate interim rate increases among the consumer classes in accordance with the existing rate design, *In re Petition of Inter-City Gas Corporation* (filed herewith), and to distribute any refunds due because revenues collectible under interim rates exceeded the revenues authorized in the final determination, in the same proportions as the interim rate increase was allocated.

The 1982 statutory revision of Minnesota's utility rate regulation system, enacted in response to public dissatisfaction with the wide fluctuations between rates under bond and authorized rates, was designed to dampen the rate fluctuations by substituting regulated interim rates set by MPUC for unregulated rates under bond set by the utility. The statute requires the interim increase to be spread ratably across the consumer classes in accordance with the existing rate design—i.e., according to the contribution made by each class to the utility's non-commodity margin. Since the new system for MPUC-set interim rates precludes any increase in the return on common equity and limits the kinds of rate base and expense items includible for purposes of an interim rate increase, one would expect the interim rate to generate revenues somewhat smaller than those authorized by the final determination. The utility bears any shortfall during the interim between the filing of its petition for a rate increase and MPUC's final determination. If the rate finally authorized provides smaller annual revenues than those generated by the interim rates, the utility must refund the excess. The refund should be distributed ratably among the consumer classes in the same proportion as

the contribution made by each class to the revenues produced by the interim rate increase. In other words, the refund process simply places each consumer class in the position it would have occupied had the interim rate been so calculated that it produced revenues equal to or less than those authorized by the final determination.

The thrust of the statute is a balancing of interests. The statute provides for interim rates geared to permit the utility to maintain its current rate of return but not to improve it pending consideration of its request to increase its rates. During the hearings on and consideration of the utility's petition, the consumers maintain their relative position while paying higher interim rates; each class of consumers continues to pay its proportionate share of revenues collectible by the utility under the interim rates. Refunds of excess revenues generated by interim revenues are returned to the consumers in the same proportions. Thus, the statutory plan is constructed to meet the public need for adequate, safe, and reasonable service during the pendency of the ratemaking proceeding while at the same time holding the utility and the several consumer classes in the same relative positions. For the reasons set out in *In re Petition of Inter-City Gas Corporation* (filed herewith), we conclude that the statute has achieved its intended balance of private and governmental interests without violation of due process requirements. *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976).

Affirmed.

YETKA, J., dissents.

YETKA, Justice (dissenting in part).

While I agree with most of the majority opinion, I dissent concerning the continuance of an unfair interim rate for users who are already over-assessed. While I agree in general that the 1982 statute allows across-the-board interim increases, it is also clear to me that the statutes contemplate a variance to that approach in special circumstances.[1] This case poses such a special circumstance because if existing rates are already adequate or more than adequate for a group of users, any increase for that group, even on an interim basis, is unreasonable and unfair. *See* Minn.Stat. § 216B.03 (1984). The Minnesota Public Utilities Commission ought not to increase interim rates across the board if such a method exacerbates an already imbalanced rate structure.

Concerning the refund policy, I believe that a user who has been charged an unfair rate during an interim period should receive most or all of the refund. This proposition raises two additional issues: First, does the statute indicate that the rates are prospective only? To this question, there are three possible answers:

1. The statute should be interpreted to allow the new rates to be set retroactively as of the date of the application since MPUC based its decision on information filed at that time. Perhaps all rates should be effective as of that date.

2. If the new rates indicate that some users were unfairly charged during the interim period, it is a due process requirement that they be given the bulk of the

---

1. Minn.Stat. § 216B.16, subd. 3 (1984) provides:

    **Interim rates.** Notwithstanding any order of suspension of a proposed increase in rates, the commission shall order an interim rate schedule into effect not later than 60 days after the initial filing date. * * * *Unless the commission finds that exigent circumstances exist,* the interim rate schedule shall be calculated using the proposed test year cost of capital, rate base, and expenses, except that it shall include: (1) a rate of return on common equity for the utility equal to that authorized by the commission in the utility's most recent

    rate proceeding; (2) rate base or expense items the same in nature and kind as those allowed by a currently effective order of the commission in the utility's most recent rate proceeding; and (3) no change in the existing rate design. In the case of a utility which has not been subject to a prior commission determination, the commission shall base the interim rate schedule on its most recent determination concerning a similar utility. (Emphasis added). Minn.Stat. § 237.075, subd. 3, governing telephone companies, includes virtually identical language.

refund, *i.e.*, that their refund be gauged to the unfair or excessive rates they were charged.

3. Finally, MPUC could adjust the interim rates at the time of the application on the basis of the exigency clauses in Minn. Stat. §§ 216B.16, 237.075.

The second issue is whether the permanent rates that are established after hearing should, in effect, be rolled back to the date of the application. I would answer that perhaps a user who has been overcharged during an interim period should have his rates temporarily reduced to make up for the overpayments.