In the Matter of the APPLICATION OF MINNESOTA POWER FOR AUTHORITY TO INCREASE RATES FOR ELECTRIC SERVICE IN MINNESOTA.

No. A11–0352.

Supreme Court of Minnesota.

Sept. 18, 2013.

As Modified on Denial of Rehearing Oct. 31, 2013.

Christopher D. Anderson, Duluth, MN; and Sam Hanson, Thomas Erik Bailey, Elizabeth M. Brama, Briggs and Morgan, P.A., Minneapolis, MN, for appellant AL-LETE, Inc. d/b/a Minnesota Power.

Lori Swanson, Attorney General, Karen D. Olson, Deputy Attorney General, Ronald M. Giteck, Ian Dobson, Assistant Attorneys General, Saint Paul, MN, for respondent Residential and Small Business Utilities Division of the Office of the Attorney General.

Jeanne M. Cochran, Assistant Attorney General, Saint Paul, MN, for respondent Minnesota Public Utilities Commission.

Andrew P. Moratzka, Stoel Rives LLP, Minneapolis, MN; and Robert S. Lee, Mackall, Crounse & Moore, PLC, Minneapolis, MN, for respondent Large Power Intervenors.

Richard J. Johnson, Valerie M. Means, Jeff Y. Lin, Moss & Barnett, Minneapolis, MN, for amici curiae Northern States Power Company, Otter Tail Power Company, and Interstate Power and Light Company.

## OPINION

GILDEA, C.J.

Appellant ALLETE, Inc. d/b/a Minnesota Power ("Minnesota Power") challenges the decision of the Minnesota Public Utilities Commission ("Commission") setting interim rates. Minnesota Power argues that the Commission exceeded its statutory authority and, in the alternative, that the record does not support the Commission's decision. Because we conclude that the Commission did not exceed its authority and that the record otherwise supports the Commission's decision, we affirm.

Minnesota statutes provide the Commission with authority to regulate public utilities in Minnesota, including regulation of the service rates that public utilities charge. *See* Minn.Stat. §§ 216B.08, 216B.16 (2012). Under this statutory scheme, a public utility cannot change service rates except by filing notice of such rate change with the Commission. Minn. Stat. § 216B.16, subd. 1. On November 2, 2009, Minnesota Power filed a notice with the Commission indicating Minnesota Power's intent to change its service rates. Minnesota Power sought an increase in rates of $80,885,213 annually, or approximately 18.9 percent. As part of its submission to the Commission, Minnesota Power also filed a petition for an increase in interim rates. Minnesota Power requested an interim rate increase of $73,296,560, or 17.1 percent annually.

Minnesota Power's petition to increase its rates was resolved through a contested case proceeding. After that process, the Commission set Minnesota Power's final rate increase at approximately $53.5 million. Minnesota Power does not challenge that decision. Rather, the challenge here is to the Commission's decision to set the interim rate increase at approximately $48.5 million. Interim rates, which are designed to "protect utilities from the potentially confiscatory effect of regulatory delay," *Henry v. Minn. Pub. Utils. Comm'n,* 392 N.W.2d 209, 213 (Minn.1986), are determined by the Commission in an ex parte proceeding and are effective during the contested case process until the new final rates go into effect. Minn.Stat. § 216B.16, subd. 3. Under Minn.Stat. § 216B.16, subd. 3(b), the interim rate "shall be calculated" using the formula set forth in the statute "[u]nless the commission finds that exigent circumstances exist." [1]

Even though the question of an interim rate increase is an ex parte proceeding, respondents Large Power Intervenors, Boise Inc., and the Residential and Small Business Utilities Division of the Office of the Attorney General ("Attorney General") submitted comments to the Commission generally opposing the amount of Minnesota Power's proposed rate increase. The Attorney General asserted that "no interim rate increase is 'just and reasonable' at this time." The Attorney General based this argument on the "near-record unemployment rates affecting the Minnesota

1. The statutory formula requires that

the interim rate schedule shall be calculated using the proposed test year cost of capital, rate base, and expenses, except that it shall include: (1) a rate of return on common equity for the utility equal to that authorized by the commission in the utility's most recent rate proceeding; (2) rate base or expense items the same in nature and kind as those allowed by a currently

effective order of the commission in the utility's most recent rate proceeding; and (3) no change in the existing rate design. Minn.Stat. § 216B.16, subd. 3(b). The "proposed test year" used to calculate a utility's interim rate in Minn.Stat. § 216B.16, subd. 3(b), is based on "the 12–month period selected by the utility for the purpose of expressing its need for a change in rates." Minn. R. 7825.3100, subp. 17 (2011).

Power service territory" and the fact that Minnesota Power's customers were "entering into the winter electric heating season, combined with the recent imposition of higher rates and the threat of interim rates on top of that."[2]

Along with this outside input, the Commission also had information provided by Commission staff. With respect to the interim rate, the Commission staff included information on Minnesota Power's three prior rate case filings, discussed the cost and non-cost factors that could influence the interim rate determination, and considered the comments filed with the Commission. The staff also analyzed whether there was a basis to find exigent circumstances based on the statutory framework and the Commission's prior practices. In analyzing whether exigent circumstances existed, the staff considered the timing of the rate increase, including the fact that customers were about to get a refund based on overpayment of interim rates during the previous rate case. Additionally, the staff considered the state of the economy and the cost of projects required to maintain reliable service. The staff made no recommendation on whether the Commission should conclude that exigent circumstances under Minn.Stat. § 216B.16, subd. 3(b), were present.

With respect to the amount of the interim rate increase, the staff noted that historically "requests for final rate increases filed by utilities are considerably larger than the final amount approved." Specifically, the staff noted that in Minnesota Power's previous two cases, filed in 2008 and 1994, the final rate increases approved were 45 percent and 56 percent respectively of the requested rates. In a 1987 rate case, however, the final rate approved was approximately double what Minnesota Power had requested. The staff also considered a 2008 rate case filed by Xcel Energy in which the final rate awarded was 58 percent of the requested rate. Based on these figures, the staff noted that there could be a "basis to find exigent circumstances based on the actual experience with [Minnesota Power] rate filings, coupled with the state of the economy." The staff then suggested that the Commission could "limit the interim rate increase to approximately 60% of [Minnesota Power's] $81 million request for final rate increase," resulting in an interim rate increase of approximately $48 million, or 11.3 percent more than the previously established rate. Ultimately, however, the staff made no recommendation regarding the amount of the interim rate increase.

The Commission issued an order on December 30, 2009, rejecting Minnesota Power's request for a $73,296,560 interim rate increase, and instead setting the interim rate increase at $48,531,128, or approximately 60 percent of Minnesota Power's final rate request. The Commission noted Minnesota Power's right to recover its cost of service and earn a fair rate of return. The Commission also discussed the statutory refund provision that allows utility customers to receive refunds of interim rates paid where the final rate is lower

---

2. Minnesota Power objected to the comments. Minnesota Power argued that under Minn. Stat. § 216B.16, subd. 3, the Commission must order interim rates "ex parte without a public hearing" and that under Commission precedent, the Commission "may not consider other parties' comments when setting interim rates." Before us, Minnesota Power does not argue that the Commission improperly considered the comments because the interim rate decision was to have been made on an ex parte basis. Rather, Minnesota Power argues that the Commission erred in relying on the comments because the comments related to matters that may not be considered under Minn.Stat. § 216B.16, subd. 3(b), when setting interim rates.

than the interim rate. *See* Minn.Stat. § 216B.16, subd. 3(c). Ultimately, however, the Commission determined that the statutory refund "may not make some ratepayers whole" because "[h]ouseholds and businesses struggling under the current adverse economic conditions—especially given the magnitude of this rate increase and its nearness in time to the last rate increase—may face economic deprivations, business losses, and even disconnections that an eventual refund would not redress."

The Commission found, therefore, that the economic conditions combined with the magnitude of the rate increase and the proximity to the previous year's rate increase constituted "exigent circumstances." Consequently, the Commission concluded that "the most reasonable and equitable course of action" was to reduce Minnesota Power's "interim rate increase to $48,531,128."

In response to the Commission's order, Minnesota Power filed a letter with the Commission objecting to the Commission's finding of exigent circumstances and reduction in the requested interim rate. Minnesota Power argued that in reducing the interim rate, the Commission violated due process by prejudging the merits of Minnesota Power's rate request before conducting an evidentiary hearing. Minnesota Power further contended that the Commission had arbitrarily considered only certain past rate cases, relied on factors outside the proposed test year cost-based statutory formula, and violated environmental policy directives by denying Minnesota Power the means to fully recover mandatory expenditures. Minnesota Power asked the Commission to immediately reconsider its interim rate decision and grant the full interim rate request. The Commission did not reconsider its interim rate decision.

Approximately 11 months later, on November 2, 2010, the Commission issued its final order on Minnesota Power's application, ultimately setting the final rate increase at $53,530,424 annually. The final rate was approximately $27.3 million less than Minnesota Power requested but approximately $5 million more than the interim rate approved by the Commission. In response, Minnesota Power filed a petition for reconsideration requesting, among other items, "reconsideration of the Commission's decision that exigent circumstances warranted a reduction in [Minnesota Power's] right to interim rate recovery." The Commission denied the petition for reconsideration.

Following the denial of its petition for reconsideration, Minnesota Power sought certiorari review with the Minnesota Court of Appeals. The court of appeals affirmed. *In re Minn. Power*, 807 N.W.2d 484, 490–91 (Minn.App.2011). The court ruled that "the commission did not err in finding exigent circumstances" and "properly exercised its discretion to set interim rates." *Id.* The court held that under the plain language of Minn.Stat. § 216B.16, subd. 3, the statutory formula does not apply when the Commission finds that exigent circumstances exist because the statute creates an exigent circumstances exception to the statutory formula. *Minn. Power*, 807 N.W.2d at 489. The court further concluded that neither the statute nor Minnesota case law specifically defines "exigent" and that, therefore, the Commission may exercise its discretion to find exigent circumstances unrelated to the statutory formula. *Id.* at 490. Finally, the court concluded that the Commission "did not err in finding exigent circumstances, and then properly exercised its discretion to set interim rates." *Id.* at 490–91. We granted Minnesota Power's petition for review.

When considering decisions of administrative agencies made in contested cases, we "may reverse or modify" an agency's decision "if the substantial rights of the petitioners may have been prejudiced because the administrative" determination was:

 (a) in violation of constitutional provisions; or

 (b) in excess of the statutory authority or jurisdiction of the agency; or

 (c) made upon unlawful procedure; or

 (d) affected by other error of law; or

 (e) unsupported by substantial evidence in view of the entire record as submitted; or

 (f) arbitrary or capricious.

Minn.Stat. § 14.69 (2012).[3] Minnesota Power generally argues that the Commission's determination of exigency must be reversed because the Commission exceeded its statutory authority under Minn.Stat. § 216B.16, subd. 3(b), when it considered non-cost factors in determining that exigent circumstances exist. Minnesota Power also argues, in the alternative, that even if Minn.Stat. § 216B.16, subd. 3(b), permits the Commission to examine non-cost factors, the Commission's conclusion that exigency existed was erroneous. We consider each argument in turn.

## I.

■■■■ We turn first to Minnesota Power's argument that the Commission exceeded its authority under Minn.Stat. § 216B.16, subd. 3(b). We may "reverse an agency decision if the decision was affected by an error of law." *N. States*

*Power Co. v. Minn. Pub. Utils. Comm'n,* 344 N.W.2d 374, 377 (Minn.1984). We apply the de novo standard of review to the question of whether the Commission has exceeded its statutory authority. *In re Qwest's Wholesale Serv. Quality Standards,* 702 N.W.2d 246, 259 (Minn.2005); *Minnegasco v. Minn. Pub. Utils. Comm'n,* 549 N.W.2d 904, 907 (Minn.1996). We "resolve any doubt about the existence of an agency's authority against the exercise of such authority." *In re Qwest's,* 702 N.W.2d at 259.

> Under Minn.Stat. § 216B.16, subd. 3(b),
>
> [U]nless the commission finds that exigent circumstances exist, the interim rate schedule shall be calculated using the proposed test year cost of capital, rate base, and expenses, except that it shall include: (1) a rate of return on common equity for the utility equal to that authorized by the commission in the utility's most recent rate proceeding; (2) rate base or expense items the same in nature and kind as those allowed by a currently effective order of the commission in the utility's most recent rate proceeding; and (3) no change in the existing rate design.

Minnesota Power argues that the Commission exceeded its statutory authority when the Commission concluded that "exigent circumstances" existed.

The Commission found an exigency based on three factors: the timing of the rate increase, the size of the proposed rate increase, and the state of the economy. Minnesota Power argues that the statute does not permit the Commission to consid-

---

**3.** The Commission did not make the decision under review here in a contested case proceeding. *See* Minn.Stat. § 14.02, subd. 3 (2012) (defining "contested case"). But we have previously applied the standard in Minn. Stat. § 14.69 even though there was not a contested case when the decision under review "involv[ed] application of an agency's expertise, technical training, and experience" and the parties advocate for the application of section 14.69. *Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency,* 644 N.W.2d 457, 463–64 (Minn.2002).

er these three factors because exigent circumstances must be tied to cost factors in the statutory formula. In addition, Minnesota Power argues that the size and timing of its requested increase are permitted under Minnesota law, and that the Commission therefore erred in basing the exigency determination on these factors.

For its part, the Commission argues that because the statute places no limits on the circumstances the Commission may consider in determining whether exigent circumstances exist, the Commission is free to consider economic conditions as well as the timing and size of the rate increase. Additionally, the Commission argues that the statute is structured such that exigent circumstances are an exception to the otherwise mandatory statutory formula and consequently the formula is not relevant to the determination of whether exigent circumstances exist. We conclude that the plain language of the statute supports the Commission's interpretation.

■ We are to construe the statute "as a whole and the words and sentences therein 'are to be understood ... in the light of their context.' " *In re Schmidt v. Coons*, 818 N.W.2d 523, 527 (Minn.2012) (quoting *Christensen v. Hennepin Transp. Co.*, 215 Minn. 394, 409, 10 N.W.2d 406, 415 (1943)); *see also Eclipse Arch. Grp., Inc. v. Lam*, 814 N.W.2d 692, 701 (Minn. 2012) (noting that we are to "read and construe the statute as a whole, giving effect wherever possible to all of its provisions, and 'interpret[ing] each section in light of the surrounding sections to avoid conflicting interpretations)' " (quoting *Am. Family Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn.2000)). And when a statute contains an exception, the exception "exempts from [the statute's] operation something that would otherwise be within it." *State v. Goodman*, 206 Minn. 203, 207, 288 N.W. 157, 159 (1939).

■ The grammatical structure of Minn.Stat. § 216B.16, subd. 3(b), indicates that the initial phrase, "[u]nless the commission finds that exigent circumstances exist," modifies, and therefore is an exception to, the remainder of the sentence, which contains the cost-based statutory formula for an interim rate. The statutory formula for calculating the interim rate, but not the exigent circumstances provision, is modified by the cost factors—rate of return, rate base, and rate design. Minn.Stat. § 216B.16, subd. 3(b). When we interpret subdivision 3(b) as a whole and in context, it is clear that the cost factors, which operate when exigent circumstances do not exist, do not control the Commission's determination of whether exigent circumstances exist. Minnesota Power's alternate interpretation, which limits the determination of whether exigent circumstances exist to the factors enumerated in the statute, would mean that the exception for exigent circumstances would overlap with the determination of an interim rate because the same cost-based factors based on the same data would be determinative in all cases. The Legislature has directed, however, that we are to give effect to all provisions in the statute—provisions that control when exigent circumstances exist and provisions that control when an exigency is not present. *See* Minn.Stat. § 645.16 (2012).

■ Moreover, that Minnesota law permits Minnesota Power to request an increase of the size at issue here, and further permits Minnesota Power to submit the request just 1 day after the last increase went into effect, does not preclude the Commission from considering these factors when assessing whether exigent circumstances exist under the statute. Nor, as indicated above, is the Commission limited to considering only factors relevant to the utility's cost of service. If the Leg-

islature intended to limit the factors that the Commission considers when determining an exigency, the Legislature could have done so expressly in section 216B.16, subdivision 3(b). It is not for this court to add words of qualification to the statute. *See State v. Carufel*, 783 N.W.2d 539, 545 (Minn.2010) ("[T]he court cannot add words to a statute not supplied by the legislature.").

In addition to the language and structure of the statute, our precedent confirms the conclusion that the exigent circumstances provision operates outside of the framework of the statutory formula. We previously indicated that "Minn.Stat. § 216B.16, subd. 3 (1984), does permit departure from the statutory formula when there are exigent circumstances." *In re Peoples Natural Gas Co.*, 389 N.W.2d 903, 907 (Minn.1986). Further, we contemplated the Commission's consideration of non-cost factors in the context of an interim rate when we held that "unless [the Commission] can be shown to have relied on certain factors to the extent that clear injustice has resulted or that its legislative

authority has been clearly exceeded, the courts may not restrict the scope of matters which [the Commission] may consider in allocating costs among consumers." *In re Inter–City Gas Corp.*, 389 N.W.2d 897, 901–02 (Minn.1986).

But, Minnesota Power argues, the constitutional due process requirement that rates be sufficient to recover the cost of service must inform the Commission's discretion in determining whether "exigent circumstances" exist. Minnesota Power cites *Bluefield Water Works & Improvement Co. v. Public Service Commission of West Virginia*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923); *Hibbing Taconite Co. v. Minnesota Public Service Commission*, 302 N.W.2d 5 (Minn.1980); and *St. Paul Area Chamber of Commerce v. Minnesota Public Service Commission*, 312 Minn. 250, 251 N.W.2d 350 (1977) for this proposition. These cases do not control, however, because they do not address the issue of the recovery of cost of service by interim rates set temporarily as part of a larger administrative process designed to determine final rate levels.[4]

---

**4.** The dissent criticizes our distinction of *Hibbing Taconite* and *St. Paul Area Chamber* from the present case on procedural grounds, stating that the "distinction cannot vitiate constitutional requirements." But for purposes of procedural due process, there are critical differences between interim and final rates, as evidenced in the distinction between the interim and final rate processes, the methods for determining interim and final rates, and the purpose for which interim and final rates were created by the Legislature. The interim rate process as described in Minn.Stat. § 216B.16, subd. 3, and *Inter–City Gas Corp.* is "ex parte" and occurs "without a public hearing," while the final rate "is the object of the entire ratemaking process, a process which fully comports with notions of due process" and may include notice, discovery, and a public hearing. *Inter–City Gas Corp.*, 389 N.W.2d at 902; *see also* Minn.Stat. § 216B.16, subd. 2. Further, the interim rate schedule reflects only costs and expenses of

the "same nature and kind as those finally allowed in the most recent rate proceeding" *Inter–City Gas Corp.*, 389 N.W.2d at 901, while the final rate is prospective and includes consideration of "all relevant facts," including the utility's projected future costs. *Bluefield*, 262 U.S. at 690–92, 43 S.Ct. 675.

The dissent also contends that the Commission failed to operate within the constitutional framework of the Fifth and Fourteenth Amendments in setting the interim rate. The dissent relies on principles applied within the context of final rates. Even if the constitutional framework on which the dissent relies were applicable here, Minnesota Power confirmed at oral argument that it is not claiming that an unconstitutional taking occurred during the 10–month interim rate period. Specifically, counsel for Minnesota Power conceded that Minnesota Power is "not really arguing [that] a constitutional taking" occurred during the 10–month interim rate period at issue in this case. Counsel also con-

Moreover, *Bluefield* specifically contemplates the consideration of "all relevant facts" to reach a determination that is "just and right in each case." 262 U.S. at 691, 43 S.Ct. 675. In *Bluefield*, the United States Supreme Court addressed the issue of whether a utility provider was receiving a "reasonable return on the value of the property used at the time it is being used" so as to avoid depriving the utility of "its property in violation of the Fourteenth Amendment." *Id.* at 690, 43 S.Ct. 675. In determining a "reasonable return," the Supreme Court stated that ascertainment of a reasonable return and value "is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." *Id.* (citation omitted) (internal quotation marks omitted). The Court continued by explaining that relevant facts could include, among many considerations, the cost of construction and permanent improvements, the value of stock and bonds, and "the sum required to meet operating expenses," but stressed that these were "all matters for consideration, and are to be given such weight as may be just and right in each case." *Id.* at 691, 43 S.Ct. 675 (citation omitted) (internal quotation marks omitted). *Bluefield* therefore does not support Minnesota Power's assertion

that the Commission erred in considering factors other than Minnesota Power's cost of service.

Finally, Minnesota Power argues that if we conclude that the Commission can consider factors unrelated to the utility's cost of service in determining that exigent circumstances exist, then the scope of the Commission's authority would be enlarged considerably beyond what the Legislature contemplated. Specifically, Minnesota Power argues that if the statutory formula in section 216B.16, subdivision 3(b), does not cabin the Commission's interim rate decision-making, then the Commission's authority to set interim rates is boundless. We disagree.

Although the Commission is not bound by the statutory formula in determining whether exigent circumstances exist, general principles in chapter 216B constrain the Commission's discretion. The statute requires that "[e]very rate made, demanded, or received by any public utility ... shall be just and reasonable." Minn.Stat. § 216B.03 (2012). Further, the statute requires that the Commission give "due consideration to the public need for adequate, efficient, and reasonable service and to the need of the public utility for revenue sufficient to enable it to meet the cost of furnishing the service ... and to earn a

---

firmed that Minnesota Power is not asking us to find in this case that the interim rate was confiscatory. The dissent nevertheless argues that Minnesota Power's assertion in its petition for review that "the Commission's decision [was] contrary to law" and "produced a confiscatory effect" is sufficient to preserve a constitutional takings claim. Such a broad standard is not consistent with our precedent. *See, e.g., George v. Estate of Baker*, 724 N.W.2d 1, 7–8 (Minn.2006) ("A petition for review to this court must specify the legal issues to be reviewed [and we] will generally not address issues that were not specifically raised in the petition for review." (citations omitted)). Finally, even if Minnesota Power had preserved the constitutional issue, Minnesota Power ad-

mitted that it did not introduce evidence of its actual interim rate period costs before the Commission, including costs arising from the decrease in demand for service or environmental mandates. Minnesota Power therefore cannot be said to have sustained its burden of proof such that we could determine whether an unconstitutional taking occurred. *See L.A. Gas & Elec. Corp. v. R.R. Comm'n of Cal.*, 289 U.S. 287, 304–05, 53 S.Ct. 637, 77 L.Ed. 1180 (1933) (holding that "the complainant has the burden of proof" to show that "confiscation is clearly established"). In short, the constitutional question that the dissent reaches out to decide is simply not presented in this case.

…

fair and reasonable return." Minn.Stat. § 216B.16, subd. 6. Finally, "[a]ny doubt as to reasonableness should be resolved in favor of the consumer." Minn.Stat. § 216B.03. All of these principles operate to constrain the Commission's decision-making.

In sum, when we construe the term "exigent circumstances" in Minn.Stat. § 216B.16, subd. 3(b), in context, we conclude that the statutory formula in section 216B.16, subdivision 3(b), does not apply when the Commission determines that exigent circumstances exist. We further hold that the Commission did not exceed its statutory authority by considering factors outside those listed in Minn.Stat. § 216B.16, subd. 3(b), in determining whether exigent circumstances were present in this case.

## II.

■■■ We turn next to Minnesota Power's alternative argument that the Commission erred in finding that exigent circumstances exist in this case. We have recognized that decisions of administrative agencies "enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977). While we review legal questions de novo, we review factual determinations made within the scope of the agency's statutory authority under the substantial evidence standard. *In re N. States Power Co.,* 416 N.W.2d 719, 724 (Minn.1987). To uphold the Commission's findings under the substantial evidence standard, we "determine whether the agency has adequately explained how it derived its conclusion and whether that conclusion is reasonable on the basis of the record." *Minn. Power & Light Co. v.*

*Minn. Pub. Utils. Comm'n,* 342 N.W.2d 324, 330 (Minn.1983).

The Commission determined that "[t]hree extraordinary circumstances combine to create exigent circumstances." The Commission relied on "the unprecedented size of the proposed rate increase ... the extremely short window (one day) between the effective date of [Minnesota Power's] last rate increase and this rate increase request; and the worst economic downturn in the past 60 years." When these factors were considered together, the Commission found that "these factors clearly carry serious potential for rate shock—and even outright hardship—for [Minnesota Power's] customers."

Minnesota Power argues that the facts of this case are not so extraordinary as to constitute exigent circumstances under Minn.Stat. § 216B.16, subd. 3(b). Although "exigent" is not defined or expressly limited in Minn.Stat. § 216B.16, the Legislature has instructed that "words and phrases" are to be construed "according to rules of grammar and according to their common and approved usage." Minn.Stat. § 645.08 (2012); *see also S.M. Hentges & Sons, Inc. v. Mensing,* 777 N.W.2d 228, 231 (Minn.2010) ("If a statute's words are clear and unambiguous as applied to an existing situation, we construe the words according to their common and approved usage."). "Exigent circumstances" is defined as "[a] situation that demands unusual or immediate action and that may allow people to circumvent usual procedures." *Black's Law Dictionary* 227 (9th ed.2009). Similarly, dictionary definitions of exigent include "[r]equiring immediate action" and "[r]equiring immediate aid or action." *The American Heritage Dictionary of the English Language* 622 (5th ed.2011); *Merriam–Webster's Collegiate Dictionary* 406 (10th ed.2001). Our case law is consistent with these definitions. We have said that

the term " 'exigent' bespeaks urgency or emergency." *Peoples Natural Gas Co.*, 389 N.W.2d at 907 (holding that the utility's proposed rate increase to only one service class "hardly suggests a pressing need of the type which would justify abandoning the statutory plan for interim rates and taking extraordinary action").

 As these definitions indicate, the question of whether exigent circumstances exist is primarily a factual determination. The Legislature has committed the question of exigency to the Commission as part of the Commission's interim rate making function. *See* Minn.Stat. § 216B.16, subd. 3(b) (delegating to the Commission the authority to "find[ ] that exigent circumstances exist"); *see also* Minn.Stat. § 216B.03 (requiring the Commission to set rates that are "just and reasonable" and "sufficient, equitable, and consistent in application to a class of consumers"); Minn.Stat. § 216B.08 ("The commission is hereby vested with the powers, rights, functions, and jurisdiction to regulate ... every public utility.... The exercise of such powers, rights, functions, and jurisdiction is prescribed as a duty of the commission."). Whether exigent circumstances exist within the context of utility interim rate setting therefore "necessarily requires application of the [Commission's] technical knowledge and expertise to the facts presented." *Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency*, 644 N.W.2d 457, 464 (Minn.2002) ("A determination whether significant environmental effects result from this project is primarily factual and necessarily requires application of the agency's technical knowledge and expertise."); *see also In re Review of 2005 Annual Automatic Adjustment of Charges for All Elec. & Gas Utils.*, 768 N.W.2d 112, 119 (Minn.2009) (holding that "[w]e consider an agency's expertise or special knowledge when ... application of the regulation is primarily factual and necessarily requires application of the agency's technical knowledge and expertise to the facts presented" (citation omitted) (internal quotation marks omitted)).

The dissent contends that the determination of whether exigent circumstances exist is not a question requiring application of the Commission's technical knowledge because it is merely a question of basic arithmetic. The dissent's conclusion is misguided. Minnesota Statutes § 216B.09, subd. 1, requiring the Commission to fix just and reasonable rates, and Minn.Stat. § 216B.16, subd. 3(b), requiring the Commission to determine whether exigent circumstances exist, mandate not only that the Commission identify the factors that impact the setting of rates and the question of exigency, but also that the Commission determine how those factors impact utility companies and ratepayers and, consequently, how those factors affect the decision on what is a just and reasonable rate. The Commission is also required to balance Minnesota Power's right to recoup its cost of service and earn a fair rate of return with the public interest in affordable utilities. It is determining the impact of the factors and balancing the competing interests of the utility and the public that require application of the Commission's experience and technical knowledge of the utility industry, not merely the identification of the factors themselves as suggested by the dissent. *See In re Review of 2005 Annual Automatic Adjustment of Charges for All Elec. & Gas Utils.*, 768 N.W.2d at 119 (holding that the Commission applied its "technical knowledge and expertise to the facts presented" and "the Commissioner's decision ... should be afforded deference" when "the Commission conducted investigations, reviewed accounting practices, and solicited comments from several agencies and organizations

involved in the regulatory process" in the course of balancing the interests of the public utility and the public to reach its decision).

Because the question of exigency in this context calls for application of the Commission's expertise to a primarily factual determination, we accord judicial deference to the Commission's determination of whether the statutory exigency standard has been met. This deference is well supported by our case law. *See, e.g., In re Review of 2005 Annual Automatic Adjustment of Charges for All Elec. & Gas Utils.*, 768 N.W.2d at 119 (deferring to the Commission's denial of a variance under natural gas regulatory scheme based on the Commission's technical knowledge and expertise); *Minn. Ctr. for Envtl. Advocacy*, 644 N.W.2d at 464 (deferring to the agency's factual determination whether the statutory standard of "significant environmental effects" was met with regard to timber harvesting project); *Cable Commc'ns Bd. v. Nor–West Cable Commc'ns P'ship*, 356 N.W.2d 658, 668 (Minn.1984) (holding that we "show[ ] deference to an agency's conclusions in the area of its expertise"); *Quinn Distrib. Co. v. Quast Transfer, Inc.*, 288 Minn. 442, 448–49, 181 N.W.2d 696, 699–700 (1970) (holding that "determination of public convenience and necessity" by the Public Service Commission was an issue of fact, which warranted "substantial judicial deference to the fact-finding processes of the administrative agency").[5]

The Commission discussed three "extraordinary circumstances" that combined "to create exigent circumstances"— the unprecedented size of Minnesota Power's proposed increase; the fact that Minnesota Power requested the proposed increase only 1 day after the increase in Minnesota Power's "last rate case went into effect"; and the fact that Minnesota Power's service territory is "in the grip of a severe economic downturn." There is no dispute that there is factual support in the record for each of the circumstances that the Commission identified. And while it is possible that the factors cited by the Commission, if considered alone, would not constitute exigent circumstances, the Commission's determination that these circumstances, when considered together, created an urgent situation satisfies the substantial evidence standard. The Commission adequately explained its determination that exigent circumstances existed and that determination is reasonable based on an examination of the record as a whole. *See Minn. Power & Light Co.*, 342 N.W.2d at 330 (discussing substantial evidence standard). As the Commission found, when the size and timing of the increase is considered against the backdrop of "the current adverse economic conditions," the requested increase "raises serious concerns about rate shock" for Minnesota Power's ratepayers. When the record is viewed as a whole and in accord with the presumption of correctness that we afford to agen-

---

5. The dissent does not contest our conclusion that the question of exigency is primarily one of fact. Yet, the dissent suggests that the judiciary is equally well-suited to make the exigency determination as the Commission. We disagree. Our precedent recognizes that proper respect for separation of powers principles prevents the judiciary from substituting our judgment for that of the Commission. *See In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 278 (Minn.2001) (explaining that "judicial deference, rooted in the separation of powers doctrine, is extended to an agency decision-maker in the interpretation of statutes that the agency is charged with administering and enforcing" (footnote omitted)); *Reserve Mining Co.*, 256 N.W.2d at 824 (expressing the court's limited role in reviewing "policy matters which are the responsibility of the legislative and executive branches" and noting that the "fixing of rates" is not a judicial act).

cy determinations within the agency's area of expertise, we hold that the Commission's determination of exigent circumstances is not erroneous. *See Minn. Power & Light Co.*, 342 N.W.2d at 330 (noting the "judgmental nature" of Commission findings); *Reserve Mining Co.*, 256 N.W.2d at 824 (holding that agency decisions "enjoy a presumption of correctness").

## III.

■■■■■ Finally, we turn to Minnesota Power's argument that the Commission erred in setting the interim rate increase at 60 percent of the final rate increase Minnesota Power requested. Specifically, Minnesota Power argues that the Commission's decision must be reversed because the Commission set interim rates by prejudging the company's final rate request. The Commission concluded that the "most reasonable and equitable course of action" in this case was to reduce Minnesota Power's interim rate increase from $73,296,560 to $48,531,128, or approximately 60 percent of its requested final rate increase. When the Commission establishes a reasonable rate of return, it is engaging in a quasi-judicial function that we review under the substantial evidence standard. *Henry*, 392 N.W.2d at 216; *Hibbing Taconite Co.*, 302 N.W.2d at 9.[6] We uphold the Commission's decision when it is supported by "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion." *Reserve Mining Co.*, 256 N.W.2d at 825. Additionally, we show "substantial judicial deference to the fact-finding processes of the administrative agency" and "the burden is upon the appellant to establish that the findings of the agency are not supported by the evidence in the record, considered in its entirety."[7] *Id.*

6. Minnesota Power and the dissent argue that the Commission's decision was arbitrary and capricious. But in reviewing quasi-judicial decisions of the Commission in setting a just and reasonable rate of return we have applied the substantial evidence standard and reserved the arbitrary and capricious standard for review of rate design determinations. *Henry*, 392 N.W.2d at 216; *Hibbing Taconite Co.*, 302 N.W.2d at 9. The establishment of a rate of return, which is at issue in this case, requires the Commission to determine based on the submissions of the utility a fair price for the provision of reliable service. *See* Minn.Stat. §§ 216B.02, subd. 5 (2012); 216B.03; 216B.05 (2012); 216B.16. By contrast, rate design decisions, which are not at issue here, are "the allocation of rates among various classes of utility customers" and are considered "a legislative function." *Hibbing Taconite Co.*, 302 N.W.2d at 9.

The dissent also argues that we should take a more assertive role or conduct a more vigorous examination of the Commission's decision. Apparently, in order to conduct that more rigorous examination, the dissent would adopt the federal hard look doctrine as defined in *Motor Vehicle Manufacturers Ass'n of the United States v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 42–43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The hard look doctrine requires the reviewing court to determine whether the agency "examin[ed] the relevant data and articulat[ed] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 42, 103 S.Ct. 2856 (internal quotation marks omitted) (citation omitted). Minnesota Power does not ask us to apply the federal standard and so the question of whether we should re-examine our standard is not presented in this case. In any event, the standard we apply requires an agency to provide an adequate explanation of how it reached its conclusion and requires the reviewing court to determine whether that conclusion is reasonable. *Minn. Power & Light Co.*, 342 N.W.2d at 330 (noting that in order to uphold the Commission's findings under the substantial evidence standard, we "determine whether the agency has adequately explained how it derived its conclusion and whether that conclusion is reasonable on the basis of the record").

7. The dissent asserts that the record is inadequate to support the Commission's consider-

Minnesota Power argues that there is not substantial evidence to support the Commission's determination of the interim rate increase because the Commission supported the decision with evidence unrelated to cost factors in the statutory formula. Minnesota Power further argues that, rather than justifying a lower rate, the economic downturn necessitated a higher rate to mitigate the impact of reduced demand and to recover its cost of service based on costs previously incurred through mandatory capital improvements. The Commission counters that it lawfully set reasonable interim rates because Minn.Stat. § 216B.16, subd. 3, grants the Commission broad discretion to adjust a utility's interim rate request when exigent circumstances exist. The Commission further argues that it acted in accordance with its precedent and traditional rate-making principles when it considered a variety of evidence and balanced the potential burdens faced by Minnesota Power and its ratepayers.

In determining what factors are properly considered by the Commission, we defer to the "analytical approach" chosen by the agency as "a matter for the agency's expertise." *Minn. Power & Light Co.*, 342 N.W.2d at 332. Judicial deference allows the agency to give effect to the "the thrust of the statute," which "is a balancing of interests." *Peoples Natural Gas Co.*, 389

N.W.2d at 909. For example, when an agency was required to consider the fairness of an insurance plan and "oversee the reasonableness of ... premiums," we found that the agency's decision was not arbitrary and capricious when it acknowledged the feasibility of the proposed change but cited several concerns including legislative intent and considerations of fairness, in reaching its decision. *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 279–81 (Minn.2001). As in *Blue Cross*, the Commission here balanced the equities between Minnesota Power and its customers during the economic downturn, cited specific economic concerns, and considered the Legislature's intent to protect consumers in setting a fair and reasonable interim rate. The Commission specifically recognized that there were two sides to the "exigent circumstances equation" and noted both "the impact of the proposed rate increase on ratepayers" and "the impact on [Minnesota Power] of reducing its interim rates request." Further, like in *Blue Cross*, the Commission here relied on the evidence submitted by its staff and applied its "technical expertise developed ... in the exercise of legislatively delegated duties and powers to protect the public interest" from the likely impact of an excessive interim rate increase. *Id.* at 283.[8]

ation of the factors leading to its exigent circumstances determination. As we indicated in *Reserve Mining*, the burden is on the appellant to establish that the Commission's findings are not supported by the evidence in the record. 256 N.W.2d at 824–27. Minnesota Power makes no claim that the factors considered by the Commission or the Commission's findings are not supported by the record. Rather, Minnesota Power contends that it was improper, as a matter of law, for the Commission to consider the factors that it did because those factors are not cost based. The dissent's contention is therefore not at issue in this case.

8. The dissent nevertheless contends that the Commission's adoption of an interim rate at 60 percent of Minnesota Power's final rate request should be set aside as arbitrary and capricious. The Commission explained that its decision to set the rate at 60 percent, "an amount slightly in excess of any final revenue requirement found in previous Company rate cases in the last 22 years," was based on its "balanc[ing] the potential burdens faced by the Company and its ratepayers in light of [the] exigent circumstances, the Company's 22 + years of rate case history, this Commission's regulatory expertise, and the public interest." The dissent apparently faults the

Considering the record as a whole, we conclude that substantial evidence supports the Commission's interim rate decision. The record reflects that the Commission considered the evidence contained in Minnesota Power's rate change filing, the record of Minnesota Power's previous rate change cases, and the information presented in the public comments regarding the impact of an interim rate increase on Minnesota Power's customers. Additionally, the Commission balanced the harmful impact of the economic downturn on both Minnesota Power and its ratepayers by adjusting the interim rate increase to make it consistent with the final rate increase Minnesota Power received in its previous two cases. In doing so, the Commission attempted to avoid an excessive burden on the ratepayers while still considering Minnesota Power's right to charge rates that are sufficient to cover its cost of service and a reasonable rate of return. And, as is directed by the statute, the Commission ultimately placed greater weight on the potentially harmful effect to the consumer of a large rate increase and set the interim rate accordingly. *See* Minn.Stat. § 216B.03 (instructing the Commission to resolve "[a]ny doubt as to reasonableness ... in favor of the consumer").

We recognize Minnesota Power's arguments that the Commission prejudged Minnesota Power's final rate request and ignored its cost of service in awarding Minnesota Power a lower interim rate than it requested. We disagree with Minnesota Power, however, because there is no evidence that the Commission failed to undertake a full and fair review as required by Minn.Stat. § 216B.16 in determining Minnesota Power's final rates. Further, Minnesota Power does not challenge the Commission's final rate determination in this case. Additionally, the evidence shows that the Commission did not ignore Minnesota Power's cost of service. Although ultimately in this case the interim rate appears to have fallen short of covering Minnesota Power's cost of service, based on the evidence considered and the process observed, the Commission's decision is not reversible error under our def-

Commission for not considering the fact that in its 1987 rate case, Minnesota Power's final rate was 193 percent of its initial request. We acknowledge that the Commission appears not to have considered the amount of the rate increase Minnesota Power received in 1987. But that failure does not make its decision arbitrary and capricious when the record reflects that in Minnesota Power's two most recent rate cases, those in 1994 and 2008, the utility received only 45 percent and 56 percent respectively of its initial rate request. *See Quinn Distrib. Co. v. Quast Transfer, Inc.*, 288 Minn. 442, 448–51, 181 N.W.2d 696, 699–701, (1970) (holding that even when there is "a conflict of evidence before the commission" and the evidence was such that the commission could have reasonably reached a contrary decision, the commission's decision was not arbitrary and capricious); *cf. Citizens Advocating Responsible Dev. v. Kandiyohi Cnty. Bd. of Comm'rs*, 713 N.W.2d 817, 836 (Minn.2006) (holding that when the agency's decision was based on an erroneous and completely unsupported assumption, the decision was arbitrary and capricious); *Wajda v. City of Minneapolis*, 310 Minn. 339, 343–44, 246 N.W.2d 455, 457–58 (1976) (holding that the city's decision was arbitrary and capricious when it was contrary to the evidence and based solely on speculation arising from prior unrelated acts). Further, the Commission's decision is distinguishable from *Eden Prairie Mall, LLC v. County of Hennepin*, cited by the dissent, because unlike in *Eden Prairie Mall* in which the tax court "failed to exercise its own skill and independent judgment" and simply adopted the County's valuation of the property, the Commission here *did* exercise its independent judgment in charting a middle course between Minnesota Power's full interim rate request and the 0 to 5 percent increase advocated by consumers. 797 N.W.2d 186, 192 (Minn.2011).

erential standard of review.[9] *Reserve Mining Co.*, 256 N.W.2d at 825–26.

We are not unsympathetic to the statutory asymmetry in Minn.Stat. § 216B.16, subd. 3(c). The statute requires "the utility to refund the excess amount collected under the interim rate schedule, including interest" when "the commission finds that the interim rates are in excess of the rates in the final determination." Minn.Stat. § 216B.16, subd. 3(c). Under the statute, however, there is no way for a utility to recoup its costs if the interim rate is properly set, but ultimately determined to be lower than the final rate. The question of available remedies under the statute, however, is a matter for the Legislature.[10]

Based on this record, we hold that substantial evidence supported the Commission's decision to set Minnesota Power's interim rate increase at $48,531,128.

Affirmed.

LILLEHAUG, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

DIETZEN, Justice (concurring).

I join in the opinion of the court but write separately to address the Minnesota Public Utilities Commission's finding that Minnesota Power's service area had suffered "the worst economic downturn in the past 60 years" to support its conclusion of exigent circumstances. Because I conclude that the finding regarding the economic downturn is an argumentative assertion not supported in the record, I would disregard that finding in determining whether substantial evidence supports the Commission's decision setting interim rates. But because other evidence supports the Commission's decision, I join in the court's decision to affirm.

Generally, we will uphold an administrative agency's decision if the reasons given

9. Minnesota Power also argues that by reducing the interim rate to 60 percent of Minnesota Power's final rate request, the Commission violated its right to procedural due process. Additionally, Minnesota Power contends that the interim rate set by the Commission did not prevent the confiscatory effect of regulatory delay. To the extent that Minnesota Power makes constitutional arguments separate from the statute-based arguments addressed above, such arguments were not preserved on appeal because they were not raised before the court of appeals or in Minnesota Power's petition for review. We therefore decline to reach these issues. *See State v. Koppi*, 798 N.W.2d 358, 366 (Minn.2011).

10. Because we conclude that the Commission did not err in setting the interim rate, the Commission's order was neither invalid nor unlawful. Minnesota Power is therefore not entitled to recoup the difference between the interim rate and the final rate during the period between when the interim rate became effective and the final rate order. *See Qwest's Wholesale*, 702 N.W.2d at 260 (noting that "the [Commission] ha[s] the implied authority to impose a recoupment remedy to compen-

sate a public utility for losses caused by an invalid Commission order"); *In re Minnegasco*, 565 N.W.2d 706, 711–13 (Minn.1997) (finding that the Commission had implied statutory authority to order recoupment to compensate the utility for lost revenue occasioned by the Commission's unauthorized imputation of its unregulated affiliated appliance business' revenues to the utility). The dissent would "reverse and remand to the Commission for recoupment proceedings even under our current standard." But even Minnesota Power admits that recoupment is not available when the Commission acts within its statutory authority but sets an interim rate that is lower than the final rate. Specifically, at oral argument, counsel for Minnesota Power stated that Minnesota Power would have "no remedy" if we determined, as we have above, that the Commission did not err. Nevertheless, the dissent cites what it contends is "broad language of *Minnegasco*," to support remand. But *Minnegasco* authorized recoupment only in the case of unauthorized action by the Commission.

for the decision are legally sufficient and those reasons are factually supported in the record. *See* Minn.Stat. § 14.69 (2012). In determining whether the reasons given for an agency's decision are factually supported in the record, we apply the substantial evidence standard of review. *In re N. States Power Co.*, 416 N.W.2d 719, 724 (Minn.1987). Under this standard, we give deference to the fact-finding of the administrative agency and will uphold the agency's findings if they are "supported by the *evidence* in the record, considered in its entirety." *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn. (Blue Cross)*, 624 N.W.2d 264, 279 (Minn.2001) (quoting *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825 (Minn.1977) (emphasis added)). Generally, the term "evidence" refers to things such as testimony, documents, and tangible objects that "tend[ ] to prove or disprove the existence of an alleged fact." *Black's Law Dictionary* 635 (9th ed.2009). In contested cases, an agency "may admit and give probative effect to evidence which possesses probative value commonly accepted by reasonable prudent persons in the conduct of their affairs." Minn.Stat. § 14.60, subd. 1 (2012).

Here, the Commission found that Minnesota Power's service territory suffered "the worst economic downturn in the past 60 years" and relied in part on that finding to conclude that exigent circumstances existed. The only support for the Commission's finding regarding the economic downturn in the service territory comes from the comments of the intervening parties. But without any documentation or substantiation, comments from parties are not *evidence;* they are merely unsupported assertions and do not possess probative value commonly accepted by reasonable, prudent persons in the conduct of their affairs. As such, the unsubstantiated statements of the intervening parties cannot provide substantial evidence to support the Commission's conclusion of exigent circumstances.

In its order setting interim rates, the Commission noted that the fact that an economic downturn existed was "generally known and based on publicly available information." But that does not excuse the requirement that the agency's conclusion be supported by "evidence *in the record,* considered in its entirety." *Blue Cross,* 624 N.W.2d at 279 (emphasis added). Generally, in a contested agency case, "[n]o factual information or evidence shall be considered in the determination of the case unless it is part of the record." Minn. Stat. § 14.60, subd. 2 (2012). Unless an agency's finding has evidentiary support that is traceable to the record, there is no way for a court to evaluate the finding and perform its reviewing function properly. Moreover, while "[a]gencies may take notice of judicially cognizable facts," Minn. Stat. § 14.60, subd. 4 (2012), the specific economic condition of Minnesota Power's geographic service territory is not a judicially cognizable fact.[1]

Because the Commission's finding relating to the "economic downturn" was not supported by evidence in the record, it should be disregarded. Nevertheless, the Commission's conclusion that exigent circumstances existed was based on two other reasons and, consequently, I concur in the court's decision to affirm the court of appeals.

1. Additionally, before taking notice of facts outside the record in contested case hearings, agencies must notify the parties in writing of the material so noticed, and afford them an opportunity to contest the facts. Minn.Stat. § 14.60, subd. 4. The Commission did not follow these procedures in this case.

ANDERSON, Justice.

While I agree with the majority that the Minnesota Public Utilities Commission (Commission) did not exceed its statutory authority when it considered factors other than those listed in Minn.Stat. § 216B.16, subd. 3(b) (2012), in determining whether exigent circumstances existed, I conclude that the interim rate assigned by the Commission was arbitrary and capricious, and thus violated Minn.Stat. § 14.69 (2012). While that conclusion, standing alone, is sufficient to require a remand for recoupment, I also conclude that the court has extended undue deference to the Commission based upon flimsy claims of technical expertise, and that the Commission's interim rate determination failed to properly account for Minnesota Power's constitutional right to a reasonable return on its property. For these reasons, I respectfully dissent.

## I.

I begin with the question of whether the Commission's decision on the interim rate was arbitrary or capricious, in violation of Minn.Stat. § 14.69. Because this proceeding merely set rate levels and did not involve the creation of a new rate design, the majority declines to apply the arbitrary or capricious standard. While such a distinction can indeed be found in *Henry v. Minnesota Public Utilities Commission*, 392 N.W.2d 209, 216 (Minn.1986), cited by the majority, the underlying basis for that distinction is unclear, and it cannot be reconciled with Minn.Stat. § 14.69. I would therefore conclude that the present dispute is subject to our general standard of review for challenges to administrative action, which, under both the plain language of the Administrative Procedure Act and our prior case law, includes arbitrary and capricious review.

## A.

Before I evaluate whether the Commission's decision in this case was arbitrary or capricious, I begin my analysis by examining the principles that should govern our court's review of agency action. The Minnesota Administrative Procedure Act, Minn.Stat. ch. 14, provides that a court "may reverse or modify the decision [of an agency] if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are ... (e) unsupported by substantial evidence in view of the entire record as submitted; or (f) arbitrary or capricious." Minn.Stat. § 14.69. The statutory language contains no indication that courts are to refrain from reviewing a decision challenged as arbitrary or capricious in rate-setting cases—or any type of contested administrative law cases, for that matter.

Our prior decisions have recognized that, as the statutory language would suggest, arbitrary or capricious review is appropriate for any challenge to agency "finding[s], inferences, conclusion[s], [and] decisions." Minn.Stat. § 14.69. In *Reserve Mining*, we held that courts should review decisions of the Pollution Control Agency and Department of Natural Resources under a standard of "lawful and reasonable, a test which we equate with whether or not they are affected by errors of law; and whether or not their findings are unsupported by substantial evidence; *and whether or not their conclusions are arbitrary or capricious." Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 827 (Minn.1977) (emphasis added). Though our holding was limited to review of those two agencies, our syllabus goes further, stating that "[i]n reviewing the decisions of administrative agencies, the district court and the supreme court are governed by the provisions of the Administrative Procedure Act

... and shall determine inter alia whether the agencies' findings are supported by substantial evidence and whether their conclusions are arbitrary and capricious." *Id.* at 811; *cf. Honn v. City of Coon Rapids*, 313 N.W.2d 409, 416–17 (Minn. 1981) (recognizing that though our case law has expressed our standards in various ways, the substantive principles of arbitrary or capricious review are always applicable).

We recently reaffirmed the broad and general applicability of arbitrary or capricious review of administrative action. In *Citizens Advocating Responsible Development v. Kandiyohi County Board of Commissioners*, we said that "[a]gency decisions are reversed when they reflect an error of law, the findings are arbitrary and capricious, or the findings are unsupported by substantial evidence." 713 N.W.2d 817, 832 (Minn.2006) (citing Minn.Stat. § 14.69). We stated that "[o]ur role when reviewing agency action is to determine whether the agency has taken a *'hard look'* at the problems involved, and whether it has 'genuinely engaged in reasoned decision-making.'" *Id.* (quoting *Reserve Mining*, 256 N.W.2d at 825) (emphasis added).

The term "hard look," used in both *Reserve Mining* and *Citizens Advocating Responsible Development*, is a reference to the type of arbitrary or capricious review practiced by the federal courts. Although we have not explicitly adopted the federal doctrine, these references reflect our understanding that the federal courts have considerable experience implementing a very similar standard of review, and that we therefore find those federal decisions to be persuasive authority in many of our own administrative law cases.

Minnesota Statutes § 14.69 is very similar to the "scope of review" section in the federal Administrative Procedure Act (APA), 5 U.S.C. § 706 (2006), which pro-vides that a "reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] ... (E) unsupported by substantial evidence." For questions of fact, the federal APA's arbitrary or capricious standard and substantial evidence standard are widely understood to be very similar, and perhaps identical. *See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys. (ADAPSO)*, 745 F.2d 677, 683–84 (D.C.Cir.1984) (Scalia, J.) ("[I]n their application to the requirement of factual support the substantial evidence test and the arbitrary or capricious test are one and the same. The former is only a specific application of the latter.... [T]he distinction between the substantial evidence test and the arbitrary or capricious test is 'largely semantic[.]'") (quoting *Aircraft Owners and Pilots Ass'n v. FAA*, 600 F.2d 965, 971 n. 28 (D.C.Cir.1979)).

Where the substantial evidence test and arbitrary or capricious test differ is in their breadth. Arbitrary or capricious review is not limited solely to questions of fact. Rather, it is a "catchall, picking up administrative misconduct not covered by the other more specific paragraphs." *Id.* at 683. In other words, an agency action may be supported by substantial evidence, but still be arbitrary or capricious. *Id.*

This arbitrary or capricious review under the federal APA has evolved into the doctrine of "hard look." *See, e.g., Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C.Cir.2006) ("Although the contours of the hard look doctrine may be imprecise, our task is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." (citation omitted) (internal quotation marks omitted)). The canonical case

describing hard look review is *Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Co.*:

> The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (citations omitted) (internal quotation marks omitted). Of particular relevance to the present dispute, the Court specified that it did "not view as equivalent the presumption of constitutionality afforded legislation drafted by Congress and the presumption of regularity afforded an agency in fulfilling its statutory mandate." *Id.* at 43 n. 9, 103 S.Ct. 2856.

Another common way by which agency action can be arbitrary or capricious under the hard look doctrine is if it constitutes "an abrupt and unexplained departure from agency precedent," *ADAPSO*, 745 F.2d at 683, although the Court has loosened this standard recently. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) (stating that an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates"). The Court was careful, however, to specify that greater justification is needed when the agency's new policy depends upon a factual finding that contradicts a factual finding underlying the previous policy, or when significant reliance interests have been created. *Id.* at 515–16, 129 S.Ct. 1800.

Given the similarity in statutory language between Minn.Stat. § 14.69 and 5 U.S.C. § 706, the decades of development in the doctrine at the federal level, and the need to ensure transparency, accountability, and reasoned decision making amongst the state's various administrative agencies, I believe it may be time to adopt a version of hard look review in Minnesota. Though this would formalize, and perhaps expand, our inconsistently applied standard of arbitrary or capricious review, I believe a strong, explicit standard would prove beneficial to regulated parties, courts, and even agencies. To expect an agency to consider all of the relevant evidence and demonstrate the ability to cogently explain its reasoning is not, as some might claim, an undue burden. It is merely a prudent safeguard against administrative abuse.[1]

---

1. I would note that we already employ a similar procedure when reviewing decisions by the tax court. Though we generally apply a clearly erroneous standard to its valuations, we do "not defer, however, when the tax court ... has failed to explain its reasoning." *Eden Prairie Mall, LLC v. Cnty. of Hennepin*, 797 N.W.2d 186, 192 (Minn.2011). The fact that we have employed this heightened review requirement for at least 18 years without ap-

## B.

Having delineated the proper scope of our review, I now turn to the Commission's interim rate determination.

There are several issues in the present dispute with inadequate development in the record. To be sure, the Commission may be able to offer the necessary evidentiary support for its conclusions, but that is part of the benefit of adopting a less deferential form of review—it forces agencies to produce a more detailed record, which would allow us to better understand and evaluate administrative decisions and ensure that just outcomes are reached. For example, the present record lacks any detailed explanation for the Commission's adoption of an interim rate that totaled 60 percent of the increase Minnesota Power sought. Perhaps this was the proper result, reached through full, impartial consideration of all available evidence—but perhaps not. Because the Commission has failed to produce a record that would allow us to verify its conclusions, neither I nor the majority can say. Similarly, the Commission has provided no legitimate expla-

nation for its selection of a group of prior rate cases that conveniently include determinations supporting its desired outcome—while excluding decisions that support the utility's position.[2]

Given these inadequacies in the record and in the agency determination here, it would be appropriate to reverse and remand to the Commission for recoupment proceedings even under our current standard. In *In re Minnegasco*, 565 N.W.2d 706, 711 (Minn.1997), we held that despite a lack of explicit statutory authorization, recoupment was an available remedy:

> The central issue in this case is whether the applicable statutes authorize the Commission, on remand, to order a recoupment remedy to compensate a public utility for lost revenue occasioned by a rate order reversed on appeal as exceeding the Commission's statutory authority. Guided by the statutory language, our case law, and the need for a sensible and fair construction of the statutes, we hold that the Commission has implied statutory authority to order such a remedy.[3]

parent problem or difficulty leads me to believe that the adoption of a version of hard look review for all administrative actions could also be accomplished without undue hardship to agencies or other courts. *See Harold Chevrolet, Inc. v. Cnty. of Hennepin,* 526 N.W.2d 54, 58 (Minn.1995) (applying heightened explanation requirement).

2. The Commission adopted a 22–year framework for measuring Minnesota Power's previous rate cases, which stopped just short of including a 1987 rate case in which Minnesota Power received approximately double what it requested. To be clear, I am not arguing that the Commission was wrong to exclude the 1987 case. An agency must draw a line somewhere, and the mere fact that some cases will be excluded by a particular choice does not make the decision arbitrary or capricious. The problem is that the Commission failed to "articulate with reasonable clarity its reasons for [the] decision." *Greater Boston*

*Television Corp. v. F.C.C.,* 444 F.2d 841, 851 (D.C.Cir.1970). The Commission's failure to explain itself—along with its conspicuous choice of a cutoff time that appears specifically designed to exclude the 1987 case— creates "danger signals which suggest the agency has not taken a hard look at the salient problems and has not genuinely engaged in reasoned decision-making." *Reserve Mining,* 256 N.W.2d at 825 (citation omitted) (internal quotation marks omitted). If so, "it is the duty of the court to intervene" to ensure the use of "articulated standards ... in furtherance of even-handed application of law, rather than impermissible whim, improper influence, or misplaced zeal." *Id.* (quoting *Greater Boston Television Corp.,* 444 F.2d at 852).

3. The majority argues that "recoupment is not available ... if we determine[], as we have above, that the Commission did not err." But the relevant question is whether Minneso-

But if the judiciary is to serve as a meaningful check against the possibility of error, abuse, and overreach in the ever-expanding administrative state, I believe we will need to adopt a more robust and assertive program of judicial review of agency action, including the implementation of an arbitrary and capricious review practice resembling the hard look doctrine.

## II.

The majority also defers to the Commission's determination that exigent circumstances existed, concluding that such a determination is an exercise of the agency's technical knowledge and expertise. I believe such deference is unwarranted. Moreover, I view the court's uncritical acceptance of the Commission's position as a troubling—but not atypical—demonstration of our long-standing failure to subject agency claims to appropriately vigorous examination.

The majority states that agency decisions "enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." The critical question we face here, not directly addressed by the majority, is this: whether the Commission's determination that exigent circumstances existed is, in fact, a situation requiring the application of the Commission's technical knowledge and expertise. I do not believe that it is.

The three "extraordinary circumstances" the Commission cited to justify its determination of an exigency were: (1) "the unprecedented size of the proposed rate increase"; (2) "the extremely short window ... between the effective date of [Minnesota Power's] last rate increase and this rate increase request"; and (3) "the worst economic downturn in the past 60 years." The first two factors require no expertise or technical knowledge beyond basic arithmetic and the use of a calendar. And the third factor, the economic downturn, might call for some technical knowledge, but not of any type in which the Commission can be said to specialize.

It is, of course, true that Minnesota Power and its customers, like other Minnesotans, have experienced significant economic challenges as a result of the post–2008 recession and the limited recovery. But the record here does not reveal what special expertise the Commission actually applied to arrive at this common-sense observation. If expert status is shown by noticing a bad economy in 2009, few Minnesotans would lack expert credentials. And although listening to the concerns of affected individuals and the regulated utility is undoubtedly important, it does not

---

ta Power would be entitled to recoupment if the court were to conclude, as I do, that the Commission *did* err in assigning the interim rate. The majority makes a fair point in noting the absence of statutory authority for recoupment under the interim rate statute, but I believe the broad language of *Minnegasco* would support my suggested remedy of recoupment here.

Put another way, a holding that the interim rate was defective would not normally establish the correct rate that *should have* been assigned. We would therefore need to remand to the Commission with orders to conduct interim ratemaking proceedings untaint-

ed by the errors identified in its earlier effort. But when, as here, the Commission has already conducted a full final ratemaking procedure examining the same period, it would seem sensible to simply remand for recoupment consistent with the revenues that would have been generated had the final rate been assigned during the interim period. To do otherwise would require the parties to ignore the evidence presented, record developed, and conclusions drawn during a more extensive proceeding directed at the same result: a rate that protects both utilities and consumers by granting the utility a reasonable return on its property—and nothing more.

employ complex technical skills exceeding the competence of Minnesota courts. To defer to the agency, as the majority does here, simply because the issue involves the Commission's general area of responsibility, is to grant it discretion far beyond the expertise we have said justifies such deference in the first place.

The majority assembles a long list of cases supporting the proposition that we defer to agencies when a conclusion requires the application of technical expertise. But my argument is not that we should abandon this standard; I believe, rather, that we should enforce it. The only argument the majority musters in support of deferring *in this case* is this: because "[t]he Legislature has committed the question of exigency to the Commission as part of the Commission's interim rate making function," determining whether exigent circumstances exist "therefore necessarily requires application of the Commission's technical knowledge and expertise to the facts presented." Why does the question of an exigency "necessarily require" technical knowledge and expertise? The majority does not say.

The mere fact that the Legislature has authorized an agency to take some action certainly does not establish that the action is of a technical nature or requires that agency's specialized knowledge. Such broad reasoning effectively immunizes every agency action—or, at least, every conclusion made as part of an agency action— as the product of technical knowledge and expertise. However appropriate this kind of deference might have been at the dawn of the bureaucratic era, it eviscerates the judiciary's ability to conduct meaningful review of agency action, and thus cannot

be tolerated in the modern age of ever-expanding administrative authority.

The majority argues that such broad deference to agencies reflects a proper respect for separation of powers principles. But I do not propose, as the majority contends, that we substitute the judgments of courts for those of agencies. To require an agency to demonstrate that sound reasoning underlies its conclusions does not violate separation of powers or infringe upon executive branch prerogatives; rather, it is a proper application of the judiciary's duty, as a co-equal branch of government, to protect the rights of all parties from agency overreach, error, and abuse. *See City of Arlington v. F.C.C.*, 569 U.S. ——, ——, 133 S.Ct. 1863, 1886, —— L.Ed.2d —— (2013) (Roberts, C.J., dissenting) ("[T]he obligation of the Judiciary not only to confine itself to its proper role, but to ensure that the other branches do so as well" is "firmly rooted in our constitutional structure.").

The Supreme Court of the United States warned us, more than half a century ago, that "unless we make the requirements for administrative action strict and demanding, *expertise*, the strength of modern government, can become a monster which rules with no practical limits on its discretion." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) (citations omitted) (internal quotation marks omitted). Moreover, "[e]xpert discretion is secured, not crippled, by the requirements for substantial evidence, findings and reasoned analysis." *Greater Boston Television Corp. v. F.C.C.*, 444 F.2d 841, 850 (D.C.Cir. 1970).[4] "A court does not depart from its

---

4. We have specifically endorsed the D.C. Circuit's reasoning on these matters. *See Reserve Mining*, 256 N.W.2d at 825 ("We endorse the Federal court's views as to the circumstances under which a court may properly closely scrutinize an administrative decision, as well as its views on the need for exercising judicial restraint and for restricting judicial functions

proper function when it undertakes a study of the record, hopefully perceptive, even as to the evidence on technical and specialized matters, for this enables the court to penetrate to the underlying decisions of the agency, to satisfy itself that the agency has exercised a reasoned discretion." *Id.* While I recognize that the judiciary must refrain from invading the province of the executive branch, the "deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia." *Volkswagenwerk Aktiengesellschaft v. Fed. Mar. Comm'n,* 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968) (quoting *Am. Ship Bldg. Co. v. NLRB,* 380 U.S. 300, 318, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965)). A proper respect for separation of powers therefore forbids—and certainly does not mandate—our acquiescence to administrative impropriety under color of expertise, especially when, as here, that claim is of dubious merit.

To be sure, many cases will feature administrative conclusions that actually involve technical knowledge and expertise, and thus warrant some (limited) level of judicial deference. But when, as here, the agency bases a significant conclusion on individual determinations that do not fall within its area of special knowledge or require technical expertise, I would have us employ a more vigorous, searching review of the agency's reasoning.

### III.

Lastly, I turn to the constitutional implications of the majority opinion. The Supreme Court has said that rates that "are not sufficient to yield a reasonable return on the value of the property used at the time it is being used to render the service are unjust, unreasonable and confiscatory, and their enforcement deprives the public

utility company of its property in violation of the Fourteenth Amendment." *Bluefield Water Works & Improvement Co. v. Pub. Serv. Comm'n of W. Va.,* 262 U.S. 679, 690, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). "The guiding principle has been that the Constitution protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory." *Duquesne Light Co. v. Barasch,* 488 U.S. 299, 307, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989) (quoting *Covington & Lexington Tpk. Rd. Co. v. Sandford,* 164 U.S. 578, 597, 17 S.Ct. 198, 41 L.Ed. 560 (1896)). "If the rate does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments." *Id.* at 308, 109 S.Ct. 609. We have also recognized that rates insufficient to allow a utility to collect enough revenue "to meet the cost of providing service and to earn a fair and reasonable return upon its investment" are "unjust, unreasonable and confiscatory." *N. States Power Co. v. Minn. Pub. Utils. Comm'n,* 414 N.W.2d 383, 388 (Minn.1987).

This constitutional requirement, which applies regardless of exigent circumstances, is the backdrop against which the Commission must set the interim rate. While the majority correctly rejects formulas and general limitations on what the Commission may consider when determining whether exigent circumstances exist, the court fails to consider whether the specific factors the Commission used to justify its decision actually did protect Minnesota Power's constitutional right to recoup its costs of service—including costs imposed by the state itself through legislation and regulation—and earn a reasonable return. The record here suggests reasons

to a narrow area of responsibility, lest it sub-

stitute its judgment for that of the agency.").

for concern.[5]

As discussed earlier, the three "extraordinary circumstances" the Commission cites to justify its determination of an exigency, and thus to abandon the statutory formula, were: (1) "the unprecedented size of the proposed rate increase"; (2) "the extremely short window ... between the effective date of [Minnesota Power's] last rate increase and this rate increase request"; and (3) "the worst economic downturn in the past 60 years." In the Commission's view, these three factors, considered together, carried "serious potential for rate shock—and even outright hardship—for [Minnesota Power's] customers." [6]

The first factor—that Minnesota Power's proposed rate increase was especially large—is irrelevant to the question of whether the proposed rate would yield the utility sufficient revenue to satisfy the constitutional requirement. If, for example, the State enacts new environmental mandates that significantly increase the cost of providing service (as Minnesota Power argues), the State could hardly then pivot and deny utilities the rate increases necessary to bring revenues back into line with expenses. Such a governmental imposition of costs upon a private entity to create a public benefit is exactly the sort of abuse the Takings Clause prohibits.

The Commission's second factor—that this rate increase comes swiftly on the heels of a previous increase—is also constitutionally irrelevant. The reasoning applied to the first factor would apply with as much force to the second—the enactment of costly mandates shortly after a ratemaking procedure does not somehow invalidate a utility's constitutional right to recoup its costs. Furthermore, a utility expecting its newly established rate to provide insufficient revenue, perhaps because of new developments that occur during a proceeding, might also be justified in commencing a new ratemaking procedure as quickly as possible so as to present its case with the benefit of new data.

---

**5.** The majority contends that Minnesota Power's taking claim is waived. I am not so sure. At oral argument, I understood the utility's counsel to be indicating that we do not need to reach the constitutional issue because we can reverse on statutory grounds, including arbitrary or capricious review. Such a sensible suggestion, see supra Part I, would seem at least as plausible as counsel choosing to forfeit a valid basis upon which his client could be granted relief. And while I concede that the claim is not presented with the specificity we would desire in Minnesota Power's petition for review, I believe the fairest reading of its argument is that the constitutional claim was included within the broader question, properly raised and preserved, of whether "the Commission's decision [was] contrary to law." See Pet. for Review at 3 (filed Jan. 4, 2012) ("The Commission's exercise of this new-found discretion in this case produced the very confiscatory effect that the interim rate statute was designed to prevent"); Appellant's Br. at 24 (filed Apr. 16, 2012) ("The Commission's decision was in excess of its statutory authority, contrary to law, and arbitrary for any one of three independent reasons: ... 3. The reduction of interim rates below Minnesota Power's documented costs for the interim period was confiscatory."). Certainly the reference to "confiscatory" actions by the Commission implicates the taking claim. All of that said, even if the majority's observation that it is a "reach" to consider the constitutional argument here is credited, there are sufficient other grounds to reverse the Commission. The importance of the constitutional analysis in this dispute is not so much related to the outcome here as it is to preventing, in future rate cases, interim and otherwise, an assumption from taking root that property rights are secondary to the public policy choices of the government and its agents.

**6.** Notably, there does not appear to be another case in which the Commission has found exigent circumstances based on factors other than cost of service to the utility.

The third and seemingly most important factor—the severe economic downturn experienced by Minnesotans in the last few years—is worse than irrelevant. Although the majority rightly notes Minnesota Power's argument that "rather than justifying a lower rate, the economic downturn necessitated a higher rate to mitigate the impact of reduced demand and to recover its cost of service based on costs previously incurred through mandatory capital improvements," its response is to once again "defer to the 'analytical approach' chosen by the agency as 'a matter for the agency's expertise.'" (citation omitted).

But the Commission clearly, if implicitly, agrees with Minnesota Power's position. The Commission argues that "[h]ouseholds and business struggling under the current adverse economic conditions ... may face economic deprivations, business losses, and even disconnections" if subjected to an unduly large rate increase. These concerns are undoubtedly excellent reasons to avoid allowing utilities to charge rates greater than Minn.Stat. § 216B.16 permits, but they do not form a valid basis to find the constitutional minimum rate to be *lower* than it would otherwise be. In fact, these circumstances suggest the opposite: that the economic downturn and consequent drop in demand requires that utilities be allowed a *higher* rate to recoup fixed capital costs incurred with the expectation—ratified by the agency but rejected in the marketplace—of greater energy consumption.

In sum, the Commission justified its decision to find exigent circumstances, and thus to set aside the statutory rate formula, by considering three factors, none of which indicates any recognition of the overriding constitutional constraints under which the agency operates and at least one of which was employed in opposition to constitutional requirements. Nor can I find any other evidence in the record that would suggest that the Commission made any effort to calculate the minimum rate of return to which Minnesota Power was entitled, regardless of exigent circumstances.

The majority addresses the constitutional issue only briefly, distinguishing the interim ratemaking procedure in this case from two other decisions of our court that were based on a full administrative procedure. *See Hibbing Taconite Co. v. Minn. Pub. Serv. Comm'n*, 302 N.W.2d 5 (Minn. 1980); *St. Paul Area Chamber of Commerce v. Minn. Pub. Serv. Comm'n*, 312 Minn. 250, 251 N.W.2d 350 (1977). But while it is certainly correct that these precedents arise in different procedural circumstances than the present dispute, that distinction cannot vitiate constitutional requirements.[7] Determining that these cases do not control the question of whether exigency exists does nothing to establish what the Constitution *does* require here.

The majority ends with a discussion of *Bluefield*, 262 U.S. 679, 43 S.Ct. 675. It notes that *Bluefield* "allows for consider-

---

7. The majority argues that I fail to appreciate "the critical differences between interim and final rates, as evidenced in the distinction between the interim and final rate processes, the methods for determining interim and final rates, and the purpose for which interim and final rates were created by the Legislature." But the Takings Clause focuses on results, not process. No amount of notice, opportunity to be heard, agency consideration, legislative approval, public policy concerns, or valid coun-

tervailing interests can relieve the State of its obligation to fully compensate an owner when it takes the owner's property. Moreover, it is puzzling, at best, to suggest that the Legislature can insulate the Commission's determination of interim rates from constitutional scrutiny by providing *less* process. The Constitution *constrains* the government—the government cannot reduce the scope of Constitutional protections.

ation of 'all relevant facts' to reach a determination" of a reasonable return and that it is not a matter of specific formulas, but then concludes that the decision "does not support Minnesota Power's assertion that the Commission erred in considering factors other than Minnesota Power's cost of service." But that was not the question. The majority's own description of Minnesota Power's argument was that "the constitutional due process requirement that rates be sufficient to recover the cost of service must inform the Commission's discretion in determining whether 'exigent circumstances' exist." Therein lies the correct application—there is no constitutional formula the Commission must apply in setting interim rates, but it must consider all of the relevant evidence in each proceeding in light of its overriding obligation to avoid assigning an unconstitutionally confiscatory rate.[8]

Finally, I note that this threat of constitutional violations in the interim ratemaking process is not merely abstract or theoretical. The majority actually concludes here that "the interim rate appears to have fallen short of covering Minnesota Power's cost of service." One would think that finding itself affirming a rate that is, in its own estimation, "unjust, unreasonable, and confiscatory" because it fails "to meet the cost of providing service," *N.S.P.*, 414

N.W.2d at 388—affirming a plainly unconstitutional taking, in other words—would lead the majority to reconsider its approach to review of agency action.

I recognize that the Commission was confronted with sympathetic filings on behalf of businesses and individuals who would likely suffer significant hardship from the proposed rate increases. But as the Supreme Court has observed, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *District of Columbia v. Heller*, 554 U.S. 570, 636, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Even if we ignore Minnesota Power's argument that these filings simply are not permitted under the interim rate statute, it is undisputed that the Fifth and Fourteenth Amendments protect the regulated utility and its property interests, even against a well-intentioned agency seeking to aid struggling consumers. Because I conclude that the Commission failed to operate within this constitutional framework in setting the interim rate here, I respectfully dissent.

---

8. The majority questions whether the constitutional framework of the Fifth and Fourteenth Amendments even applies in the context of interim rate making. I would not have thought it controversial to assert that constitutional protections against the taking of property without compensation are always applicable. The Supreme Court has stated that to avoid a constitutional violation, the utility must receive a "reasonable return on the value of the property used *at the time it is being used.*" *Bluefield*, 262 U.S. at 690, 43 S.Ct. 675 (emphasis added). Thus, by its plain terms, *Bluefield* indicates that the constitutional obligation to provide a return greater than the cost of providing service is

continuous, and is not subject to some sort of exemption during interim ratemaking procedures. Moreover, it is difficult to reconcile the majority's apparent belief that interim rates cannot be confiscatory with its earlier statement that interim rates are designed to "protect utilities from the potentially confiscatory effect of regulatory delay." Regulatory delay, in this context, means the previous rate remaining in effect during the final ratemaking procedure. If operating under an insufficient rate while awaiting a new rate determination can be confiscatory, then the constitutional framework obviously applies. The administrative procedures involved are irrelevant.